ELIZA A. DUTCHER, Administratrix, *vs.* GEORGE CULVER and others.

March 22, 1877.

On Reargument, October 10, 1877.

**Distress for Rent.**—A landlord's common-law right of distress for rent in arrear, as modified by St. 2 Wm. & Mary, *c.* 5, allowing the property distrained upon to be sold, exists in this state.

**Same—When Landlord is Assignee of Tenant in Trust for Creditors.**—A landlord to whom, prior to taking a distress, the property subsequently distrained upon, has, with other property, been assigned in trust for creditors, does not, by accepting such trust, waive his right of distress.

**Same—Where Landlords are Tenants in Common.**—Tenants in common should distrain severally; but if they join in distraining, their joinder is an irregularity covered by St. 11 Geo. II., *c.* 19, by which it is provided "that for any unlawful act done (in the taking of a distress) the whole shall not be unlawful, or the parties trespassers *ab initio*, but the party grieved shall only have an action for the real damage sustained, and not even that if tender of amends is made before action brought."

**Same—Rent Held to be Certain.**—For the purpose of a distress, rent is sufficiently fixed and certain which is capable of being reduced to a certainty by computation.

**Order that Receiver be Appointed—Effect.**—An order that a receiver shall be appointed to take charge of certain goods, does not place such goods in *custodia legis.*

The foregoing rulings affirmed on motion for reargument, and—

**Abolition of Remedy by Distress by Statute, Pending Appeal.**—*Held*, that the passage by the legislature, after the submission of the case to this court, but before its decision was rendered, of an act abolishing the remedy by distress, furnishes no ground for a reargument of the case. The defendants having distrained, and taken the property distrained upon into possession, before the passage of the act mentioned, their rights under their distress are unaffected by such act.

The plaintiff, as administratrix of the estate of her late husband, Gilbert Dutcher, brought this action against George Culver, John Farrington, certain heirs-at-law of William J. Cullen, deceased, E. R. George, and James Mullins, praying

that the defendants be enjoined from selling certain personal property which had been distrained for rent in arrear by the defendant Mullins, as agent of the other defendants, (except George,) that the distress be declared void, and for other relief. A demurrer to the answer was overruled by the district court for Ramsey county, *Simons, J.*, presiding, and the plaintiff appealed. The material facts shown by the pleadings were as follows:

On May 11, 1870, the defendants Culver and Farrington, and William J. Cullen, being owners in fee of the real estate known as the Metropolitan Hotel in the city of St. Paul, demised the same, by indenture of lease, to Gilbert Dutcher, plaintiff's intestate, for the term of seven years from July 1, 1870, the lessee covenanting to pay, as rent for the demised premises, ten per centum of the entire gross receipts and earnings which should be taken and received by him from the hotel, such per centum to be payable at the end of each month, and to be estimated upon a full account of all such receipts and earnings, made up at the end of each month; and the lessee also covenanting to furnish the hotel, and keep it as a first-class hotel. The lease contained a provision that the rent should be payable, one-half to William J. Cullen, and the other half to Culver and Farrington in equal proportions, but no clause authorizing a distress. Dutcher, the lessee, in partnership with the defendant George, furnished the hotel and kept it, in the firm name of Gilbert Dutcher, until his decease, intestate, in October, 1873. After his decease, and in the same month, the defendant George and the widow and children of Gilbert Dutcher made an arrangement for carrying on the business of the late firm, (under which arrangement they were held, in *Delaney* v. *Dutcher*, 23 Minn. 373, to be partners,) and under this arrangement the business was carried on, in the name of E. R. George, who was the managing partner, until May 29, 1875, when George made three general assignments, in trust for creditors, to the defendant Culver, the first of his individual prop-

erty, including his interest in the furniture and lease; the second, as surviving partner of the firm of Gilbert Dutcher, of the property of that firm; and the third of the property of E. R. George. Under these assignments the defendant Culver took possession of the hotel and furniture, and carried on the hotel business.

In November, 1873, the plaintiff was appointed administratrix of Gilbert Dutcher, and in December, 1874, the defendant George executed to plaintiff, as administratrix, a mortgage of his one-half interest in the furniture, fixtures, etc., of the hotel, to secure the payment of $9,500, which mortgage was duly filed, and had not been paid or satisfied when this action was brought.

After the making of the assignments to defendant Culver, and on July 17, 1875, the plaintiff, as administratrix, brought an action in the late court of common pleas of Ramsey county against the defendants George and Culver, and others, for an accounting and settlement, and division of the assets, of the late firm of Gilbert Dutcher, and to obtain from defendant Culver a division of the property of the firm. That action having been brought to trial, the court, on February 16, 1876, rendered a decision, and ordered an account to be taken, etc., and that a receiver be appointed to take possession of and sell the assets of the late firm, etc. On the following day, February 17, 1876, the defendants in that action obtained from the court an *ex parte* order staying proceedings on the former order for twenty days, to allow them to appeal therefrom.

Before the expiration of the twenty days, and on March 3, 1876, the defendants in this action (except George and Mullins) executed and delivered to the defendant Mullins a joint warrant, authorizing and directing him to distrain the goods and chattels of the late firm of Gilbert Dutcher, being upon such demised premises, and to sell the same according to law, for the payment of $3,066 63-100, rent due and unpaid, under the lease, from September, 1874, to May, 1875, both

months inclusive, of which amount the sum of $920 63-100 was due to the defendant Culver, the sum of $920 63-100 to the defendant Farrington, and the sum of $1,225 17-100 was due to the defendants, the heirs of William J. Cullen, in various proportions. On the next day, March 4, 1876, the defendant Mullins, by virtue of the warrant, distrained the furniture, etc., of the hotel, and on March 8, 1876, he served on the plaintiff as administratrix an inventory of the property distrained, with a notice stating that it had been distrained, etc., and that if she did not pay the rent so in arrear within five days from the service of the notice, he would, at the expiration of that time, cause the property to be appraised and sold according to law; and plaintiff then brought this action.

*Harvey Officer* and *Horn & Billson,* for appellant.

*R. B. Galusha* and *Davis, O'Brien & Wilson,* for respondents.

BERRY, J. The main question presented by this case is whether the common-law right of a landlord to distrain for rent in arrear, exists in this state. Section 12 of the organic act of the territory of Minnesota (passed March 3, 1849,) provides that "the laws in force in the territory of Wisconsin, at the date of the admission of the state of Wisconsin, (May 29, 1848,) shall continue to be valid and operative therein," (*i. e.* in the territory of Minnesota,) "so far as the same be not incompatible with the provisions of this act, subject nevertheless to be altered, modified or repealed by the governor and legislative assembly." The constitution of this state, (adopted in 1857,) in section 2, of the schedule, declares that "all laws now in force in the territory of Minnesota, not repugnant to this constitution, shall remain in force until they expire by their own limitation, or be altered or repealed by the legislature."

If, at the date of the admission of the state of Wisconsin, the common-law right of distress for rent was in force in the territory of Wisconsin, it is in force here, if it is not incom-

patible with the provisions of our organic act, nor repugnant to the constitution of this state, and if it has not been altered or repealed by our territorial or state legislature. That it was in force in the territory of Wisconsin, at the date mentioned, is authoritatively settled, so far as the state of Wisconsin is concerned, by the case of *Coburn* v. *Harvey*, 18 Wis. 147. The decision in that case is, of course, not binding or conclusive in this state; but the conclusion arrived at, as well as the reasoning by which it is supported, are entirely satisfactory to us. We therefore accept the decision, not only as an authoritative statement of the law of Wisconsin, because pronounced by the highest tribunal of that state, but as in itself, and independent of the matter of authority, establishing the fact that, at the date of the admission of the state of Wisconsin, the common-law right of a landlord to distrain for rent in arrear, was in existence in the territory of Wisconsin. See also *State* v. *Pulle*, 12 Minn. 164; *Blackman* v. *Wheaton*, 13 Minn. 326. It is not claimed (and we see no ground upon which it could be claimed) that the right of distress in question is incompatible with our organic act.

It is claimed, however, that by the Revised Statutes of the territory of Minnesota, *c.* 137, § 1, the Wisconsin statute of 1839, referred to in the opinion of the court in *Coburn* v. *Harvey*, was repealed. If this be admitted, it does not follow that the right of distress was thereby taken away. This law of 1839, as the supreme court of Wisconsin say, "recognized the existence of this right," and "assumed it as already existing." The repeal of this law (a statute regulating the action of replevin where the property had been taken for a distress) did not take away the right of distress, since the statute did not create the right, but merely testified to its existence by recognizing it and assuming it to exist. That it was not in fact the intention of the Revised Statutes, either in chapter 137, § 1, or elsewhere, to take this right away, is fairly inferable from Rev. St. *c.* 70, § 39, which prescribes the place of trial of an action "for the recovery of personal property distrained for

any cause." If, as is claimed by the plaintiff's counsel, no other right of distress existed or was understood to exist here, except the right to distrain beasts *damage feasant*, the general words "distrained for any cause," would hardly have been used. In their natural and ordinary meaning, they recognize more than one species of distress, and as, so far as we are aware, the only kinds of distress to which they would have reference are the landlord's right of distress, and the right to distrain beasts *damage feasant*, both of these may fairly be presumed to have been contemplated by the statute.

Upon this question of repeal, Rev. St. *c.* 49, §§ 31, 32, 33, are also of some value. Section 31 enacts that every person in possession of land out of which rent is due shall be liable for the proportionate amount of rent due from the land in his possession, although it be only a part of what was originally demised. Section 32 enacts that such rent may be recovered in a civil action. Section 33 provides that "nothing contained in the preceding sections shall deprive landlords of any legal remedy for the recovery of their rent, whether secured to them by their leases, or provided by law." This section, though it is not conclusive, has some tendency to show that it was the intention of the Revised Statutes to preserve whatever legal remedies for the recovery of rent were possessed by landlords, and, among others, the remedy by distress, which, as we have before endeavored to show, was "provided by law."

What we have thus said with reference to the Revised Statutes is equally applicable to the General Statutes, in which Rev. St. *c.* 70, § 39, appears as *c.* 66, § 38, and Rev. St. *c.* 49, §§ 31, 32, 33, appear as *c.* 75, §§ 18, 19, 20.

Our references to these provisions of the Revised and General Statutes, and our comments upon them, are also a sufficient answer to the position taken by the plaintiff's counsel that "the theory of our code is inconsistent with, and repugnant to," the remedy by distress.

The plaintiff's counsel argue that the remedy by distress is

repugnant to the constitution of this state. They claim that it violates art. 1, § 8, which declares that "every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive in his property," because, to entitle a person whose property is distrained for rent to replevy, he must give security, which he may not be able to give. As suggested by defendants' counsel, this claim begs the whole question, by assuming that the right of distress, which, if it existed at all, is a legal right, is a wrong or injury to property. If exercised in a proper case, it is no more a wrong than the right of a chattel mortgagee to take possession of property mortgaged, upon the mortgagor's default. If the distress is not made in a proper case—if it is wrongful—the owner of the property distrained has his remedy by action in the nature of trespass, trover, or upon the case, as circumstances may require. Taylor Land. & Ten. c. 15. He need not resort to replevin to obtain a remedy. If he does, it is upon the same terms upon which he can resort to it in any other case—namely, by giving security. So far as replevin is a remedy for a wrong or injury to property, the same objections will apply to the requirements of security in any other case—as, for instance, in a case of replevin for beasts distrained *damage feasant*—as in that of a distress for rent. Several other answers to plaintiff's claims under this head are suggested by defendants' counsel, but we need not consider them.

The other grounds upon which plaintiff's counsel claim that the right of distress is incompatible with our constitution are not very much insisted upon, and it seems to us that no argument is needed to show them to be untenable. Upon this branch of the case, then, our conclusion is, that, as at the date of the admission of the state of Wisconsin into the Union, the landlord's common-law right of distress for rent in arrear was in force in the territory of Wisconsin, and as such right of distress is not incompatible with the provisions of our organic act, nor repugnant to the constitution of this

state, and has not been altered or repealed by our territorial or state legislature, it is in force in this state.

With reference to the statute 2 Wm. & Mary, c. 5, which gave the right to sell a distress, (in that respect changing the common law,) we agree with the supreme court of Wisconsin in *Coburn* v. *Harvey*, 18 Wis. 147. It is there held, upon grounds to which we see no objection, that the common law of a state which had no political existence before the revolution, is the common law as modified and amended by English statutes passed prior to our revolution. This definition, of course, has no reference to such portions of the common law as are inapplicable to a given state, or to any changes or repeals which may have been effected by legislation in such state. As the statute of William & Mary was passed long before the revolution, it was held to be part of the common law of distress in Wisconsin, and, for the same reason, it is to be held to be part of the common law of Minnesota.

This disposes of the main question in the case, and brings us to consider the plaintiff's objections to the manner in which the distress was made.

The lease under which the rent distrained for accrued was made by George Culver, John Farrington and William J. Cullen, owners of the leased property. Culver and Farrington are defendants in this action. The other defendants, except Mullins, are the heirs at law of Cullen, who has deceased, and are owners of his interest in the demised premises. All of the defendants, except Mullins, joined in the distress, and by their warrant authorized and empowered Mullins, as their bailiff, for them and each of them, to distrain, etc.

By the terms of the lease the rent was payable, one-half to Cullen, and the other half in equal portions to Culver and Farrington. The warrant specified the whole amount of rent due, and the proportion of the same due to each of the distrainors. It appeared also that Culver was holding the property distrained as assignee under an assignment, the validity

of which is called in question by the plaintiff. It is claimed by the plaintiff that Culver, by accepting the trust conferred upon him by the assignment, waived his right of distress, the two being incompatible. In our opinion the supposed incompatibility does not exist. It is true that there is to some extent a conflict of interest between Culver as assignee, and Culver as landlord. Nevertheless, there is no reason why he cannot exercise his right of distress, and with all due regard to the rights of creditors interested in the assignment. His double position is certainly somewhat delicate, but we see no reason why he may not hold it and exercise all its rights, being of course responsible for any misconduct or neglect of duty.

It is further claimed that the distrainors, being tenants in common, could not make a joint distress. The rule certainly is that such tenants should distrain severally. Taylor Land. & Ten. § 569. We are, however, of opinion that the joinder may properly be regarded as an irregularity in the manner of procedure. As such it is covered by the statute 11 Geo. II., c. 19, by which, as Blackstone says, (3 Com. 15,) it is provided "that for any unlawful act done (in the taking of a distress) the whole shall not be unlawful, or the parties trespassers *ab initio;* but the party grieved shall only have an action for the real damage sustained, and not even that, if tender of amends is made before any action is brought." See also Taylor Land. & Ten. §§ 613, 614, 736, 737.

It is further objected by plaintiff that there was no right of distress in this instance, because the rent was not fixed or certain. By the terms of the lease the rent is to be, not a precisely named sum of money, but ten per cent. of the gross receipts and earnings of the leased property, to be estimated upon a full account made up at the end of each month. Upon the maxim *id certum est, etc.,* this provision of the lease sufficiently fixes and ascertains the rent; for it is capable of being reduced to a certainty by computation. *Smith* v. *Fyler,* 2 Hill, 648; Taylor Land. & Ten. §§ 561, 562. Besides,

the allegations in the answer that the gross receipts and earnings were properly stated and ascertained, and that the amount specified in the warrant is due, are admitted by the demurrer.

The plaintiff's last point is that the property distrained upon was *in custodia legis,* because, before the distraint, the district court had made an order that a receiver be appointed to take charge of this with other property. What would have been the case if a receiver had been appointed, we need not inquire; a mere order that one shall be appointed certainly does not have the effect claimed.

Order affirmed.

---

After the filing of the foregoing opinion, counsel for the appellant Eliza A. Dutcher, made a motion for a reargument, based on the statute recited in the first of the two following opinions.

*Harvey Officer* and *H. J. Horn,* for the motion. The act is in terms retrospective, and is constitutional since it affects the remedy only, and leaves the landlord the common remedies of other creditors. The case is like that of the repeal of the law authorizing an attachment, after property has been seized on the writ, but before judgment. *Stephenson* v. *Doe,* 8 Blackf. 508; *Butler* v. *Palmer,* 1 Hill, 324; *Bailey* v. *Mason,* 4 Minn. 430 (546;) *Stine* v. *Bennett,* 13 Minn. 153. If the act has this effect, the decision subsequently rendered is erroneous. The point is such as to warrant a reargument, within the rule in *Derby* v. *Gallup,* 5 Minn. 85 (119.)

*C. K. Davis,* for respondents.

The act approved March 3, 1877, cannot affect the landlords in this case. It is not, in its terms, retrospective. To be so, that intention must be unequivocably expressed. Dwarris on St. 162, n. 9; *Finney* v. *Ackerman,* 21 Wis. 268; *Veeder* v. *Guppy,* 3 Wis. 502; *Berry* v. *Doty,* 5 Wis. 605; *Streubel* v. *Railroad Co.,* 12 Wis. 67; *Tillotson* v. *Millard,* 7 Minn.

419 (513;) *Edson* v. *Newell*, 14 Minn. 228; *Davidson* v. *Gaston*, 16 Minn. 238; *Wilson* v. *Red Wing School District*, 22 Minn. 488.

If held retrospective, it is void as to this case. The landlords had distrained the property in question before the passage of the act. *Stone* v. *Bassett*, 4 Minn. 215 (298;) *Hayward* v. *Judd*, 4 Minn. 375 (483;) *Goenen* v. *Schroeder*, 8 Minn. 344 (387;) *Tillotson* v. *Millard*, 7 Minn. 419 (513;) *Kelly* v. *Dill*, 23 Minn. 435; Cooley Const. Lim. 361.

BERRY, J. After the above-entitled case was submitted to this court, but before its decision, the legislature passed an act, approved March 3, 1877, which reads as follows, viz.: "Be it enacted, etc. Section 1. That the remedy by distress for rent is hereby abolished. Sec. 2. This act shall take effect from and after its passage." Laws 1877, c. 140. (Gen. St. 1878, c. 75, § 39.)

This case came to this court upon an appeal from an order overruling a demurrer to the defendants' answer. The question before this court was simply whether the demurrer was properly overruled. Upon this question, it is apparent that the act of March 3d can have no possible bearing. Hence, its passage furnishes no support whatever to the plaintiff's motion for a reargument of the case. The motion is, therefore, denied.

The effect of the act mentioned upon the rights of the defendants under the distress made by them was fully discussed upon both sides, on the motion for a reargument, and, although its determination is not necessary to the disposal of the motion, it is very important to all concerned, with reference to future proceedings. We will, therefore, depart from our customary practice, and briefly express our opinion as to the effect of the act referred to. The act is, in terms, both prospective and retrospective; for it assumes to abolish the remedy by distress—that is, to destroy it utterly and completely. But, in our opinion, it was not competent for the legislature to give the act a retrospective effect, as respected

the defendants in this case. What the legislature might properly have done with regard to the right of a landlord to distrain, who had taken no proceedings to distrain, and whose right would certainly be in the nature of a mere right to an entirely future remedy, we need not now inquire. In the case at bar, the defendants had distrained, and had taken the property distrained upon into possession. By the exercise of their authority to distrain, they had acquired a valuable and vested right — a right of property — and of this it was not competent for the legislature to deprive them. *Tillotson* v. *Millard,* 7 Minn. 419 (513.)

In our opinion, then, the rights of the defendants, under the distress made by them, are unaffected by the act in question. Motion for reargument denied.

―――――――

At the same time with the motion for reargument on behalf of Mrs. Dutcher, a like motion was made on behalf of R. J. Marvin, who had been appointed administrator of the estate of Gilbert Dutcher, deceased, in the place of Mrs. Dutcher. See *Dutcher* v. *Culver,* 23 Minn. 415.

*W. P. Clough,* for the motion.

The right of the landlord to distrain the chattels of his tenant for the non-payment of rent, in the absence of express agreement for such right, has never existed in this state, because (1) the remedy by distress, as it existed at common law, in cases other than those arising upon grants expressly reserving to the landlord that remedy, has been completely abrogated by the constitution of the state; and (2) no statute has ever been in force in this state, conferring upon landlords the right to distrain for the non-payment of rent, in any case whatsoever.

1. Under the common law the right to the remedy by distress arose in two distinct ways, (1) by act of law, and (2) by act of the parties. Accordingly, at the common law, rents were divided into (1) rents service, which were rents to which the

remedy by distress was annexed by act of the law; (2) rents charge, which were rents to which the remedy by distress was annexed by act of the parties; and (3) rents seck, which were rents to which the remedy by distress had not been annexed, either by act of the law or act of the parties. 2 Bl. Com. 42. Rent service was purely feudal, both in its origin and its legal nature. "Rent service is so called because it hath some corporeal service incident to it, as at the least fealty or the feudal oath of fidelity." 2 Bl. Com. 42.

Feudal tenures were divided into two grand classes, corresponding to the character of the services which the tenant was liable to render to his lord, (1) tenure by knight-service— that is to say, upon condition of rendering military services, which were necessarily uncertain in quantity; and (2) tenure in socage—that is to say, upon condition of rendering to the lord services certain both as to character and quantity. 2 Bl. Com. c. 5–6. In England by 12 Charles II. c. 24, tenures by military service were abolished; but all lands in the kingdom were declared by the same act to be held in socage, so that all tenures in the kingdom remained as strictly feudal in nature as they had been before. Even as early as Lord Coke's time, there had not been any allodial lands in the kingdom for a great period, save those belonging to the crown. 2 Bl. Com. 60.

The fundamental element in all feudal tenures, whether the estate was for years, for life or in fee, was the right of the reversioner to require the tenant to do fealty to him. In modern times the oath of fealty has not, in practice, been insisted upon; but even at this day, where socage tenures prevail, the tenant for years, for life or in fee, is under legal duty to do fealty to the owner of the reversion, if the latter insist upon it, unless otherwise provided by statute. 2 Bl. Com. 86; 3 Kent, 510–512; *Cornell* v. *Lamb*, 2 Cow. 652, 659, per *Savage*, C. J.

It was an incident annexed by the common law to all feudal tenures that the reversioner might distrain the goods of his

tenant in fee, for life, or for years, as a remedy for failure by the tenant to do fealty, or to do any services, or to pay any rents, by him owing to the reversioner on account of his tenancy. And the right to the remedy by distress, in the absence of any express agreement for it, was not conferred by the common law upon any other class of persons than the reversioners of land held by a strictly feudal tenure. As the right to demand from the tenant of lands the oath of fealty was always deemed, in the common law, the most conclusive evidence that the tenure of the lands was feudal in its character, for that reason the existence of the right to exact fealty from a tenant was always treated as the test of the right to use the remedy by distress against him, in the absence of express agreement between the parties. At the common law, the right to the remedy by distress and the right to fealty were absolutely inseparable. The former right was never conferred by the act of the law itself, except in cases where the latter existed. 2 Bl. Com. 42; 3 Kent, 460, 461; Taylor, Land. & Ten. § 559.

In the fact that the right to distrain was annexed by common law only to rents owing by the occupants of land holding the relation of feudal tenants to the person entitled to the rents, the practice of expressly stipulating for the right to distrain had its origin. After the statute of Quia Emptores, 18 Edw. I. *c.* 1, forbidding subinfeudation, if A, holding lands in fee of the lord of the manor, enfeoffed B of the same lands in fee, reserving to himself a rent out of the lands, B became the feudal tenant, not of A, but of the lord of the manor, and subject to do fealty and render all other feudal services to him, instead of to A, to whom he owed no other duty than to pay him the rent reserved. And as B owed no fealty or other feudal obligation to A, the common law gave to A no incidental right to the remedy by distress to enforce payment of his rent. Hence, in order to secure the benefits of this remedy, it was necessary and customary for the feoffor in such a conveyance to expressly stipulate for the right to distrain.

Where he did so, the rent was termed a rent charge. Where he failed to do so, the rent was called a rent seck—that is, a dry or barren rent, because the person entitled to it was left without any right to distrain. See authorities last above cited. Under the common law, then, the remedy by distress existed only (1) in favor of a reversioner of whom a tenant held lands by a strictly feudal tenure, and (2) in favor of the owner of a rent to which the right to distrain was annexed by express stipulation in the deed reserving the rent. These rules of the common law remained in force in England until the statute of 4 Geo. II. c. 28, which gave to all owners of rents the right to distrain for the non-payment thereof. The right of a landlord to distrain for non-payment of rent, unless derived from express contract, or existing as a mere incident to a feudal tenure, is, therefore, wholly the creature of statute. In New York, by a law passed in 1787, it was enacted that all tenures of land held at any time before July 4, 1776, should thereafter be tenures in socage, and that certain enumerated feudal incidents to that kind of tenure should cease to exist; and that the tenure of all grants of land made by the state should be allodial and not feudal, and be discharged of fealty and all other services. But it was expressly provided, in the same act, that the lands thereafter to be held in socage tenure should not be deemed to be "discharged of any rents certain, or other services incident or belonging to tenure in common socage, due to the people of this state, or any mesne lord or other person, or the fealty or distresses incident thereto." 3 Kent, 509. The tenures in that state continued to be in socage until 1828, when, by the Revised Statutes, all lands were declared to be allodial, and all feudal tenures, of every description, with all their incidents, were abolished. 1 New York Rev. St. 718, § 3. But to preserve the incidental right to distrain for rent, which the broad terms of this section would have inevitably swept away, the provisions of section 3 were qualified by the following section, which enacted that "the abolition of tenures shall not take away or discharge any

rents or services certain, which at any time heretofore have been, or hereafter may be, created or reserved." 1 N. Y. Rev. St. 718, § 4.

The constitution of this state (art. 1, § 15) reads as follows: "All lands within this state are declared to be allodial, and fendal tenures of every description, with all their incidents, are prohibited." This provision has been taken, either mediately or immediately, from the section of the New York statute above quoted, but it is stronger than that of the statute, for it prohibits instead of abolishing, and contains no saving of rents or services. Hence, every right conferred upon a reversioner of lands by the common law has been utterly swept away by this constitutional provision, including the incidental right to distrain for non-payment of rent, and it may be seriously doubted whether the legislature of the state would have any power to confer the right to distrain by express statute, since the incidental right to distrain is entirely prohibited.

2. The right to distrain for non-payment of rent, in the absence of express contract therefor, has never been conferred by any statute in force within this state. It certainly has never been conferred by any statute enacted by the state itself, and if conferred by any statutes, it must be by English statutes passed prior to July 4, 1776. The English statutes materially altering the rules of the common law in respect to distress for non-payment of rent, were 2 Wm. & Mary, *c.* 5, (permitting a sale of the chattels distrained,) and 4 Geo. II. *c.* 28, the effect of which has been already stated. Neither of these statutes has ever been in force in this state.

The question—What portions of the English common law and statutes are in force in this state?—is necessarily a historical question. Such parts of the English common law and statutes as are law in this country have become so in one—sometimes in both—of two different ways, (1) by importation, and (2) by legislative adoption. In each of the original colonies, the common law and such English statutes

amending it, passed before the planting of the colony, as were of a general nature and not local to the kingdom, became of force in the colony, upon the planting thereof, by importation. But no act of parliament extends to any colony, unless by express provision in the act itself, (1 Bl. Com. 108,) so that no act of parliament passed after any one of the colonies was planted, acquired any force therein, except through adoption by the law-making power of the colony. Hence, the same English statutes were not in force in all the colonies.

Laws do not come into a country by importation unless along with a colony, and then only in case the country where the colony is planted is vacant and unoccupied, and has been acquired by discovery and occupation; but not when the country has been acquired, by cession or conquest, from another power. (1 Bl. Com. 107-8.) Hence, Blackstone was of opinion that even the original American colonists did not carry with them the English laws, because the country occupied by them was conquered from or ceded by the Indian nations, and the contrary view held by American lawyers is based on a denial of any rights of the Indians to the country. 1 Story on Const. 100-108.

No portion of the English common law or statutes ever came into force within the region now comprised in the state of Minnesota, by importation, or otherwise than by legislative adoption.

That part of the state lying east of the Mississippi river originally formed part of that vast region, which, shortly after the close of the American Revolution, became known as the Northwest territory, and was bounded on the north by the Great Lakes and their connecting waters and British America, on the east by New York and Pennsylvania, on the south by the Ohio river, and on the west by the Mississippi river. This region was explored by the French many years in advance of any other civilized people. At a very early period they laid claim to the whole region, and established military and trading posts at several points. By the treaty of Utrecht

between Great Britain and France, in 1713, the countries forming the valleys of the Mississippi and St. Lawrence rivers were reserved by and conceded to France, and in all the subsequent disputes as to the eastern and southern boundaries of the dominions thus reserved to France, the title of that power to the country now comprising the states of Michigan, Wisconsin and Minnesota, and the northern parts of Ohio, Indiana and Illinois, was never questioned. By the treaty of Paris, between the same powers, in 1763, all the French possessions in America lying east of the Mississippi river, including the country afterwards known as the Northwest territory, were ceded to the English.

But no English colony was ever planted in any part of this region. It was the settled policy of the British government to prevent its colonization. On October 7, 1763, within a few months after the signing of the treaty of Paris, the English crown issued a proclamation providing for the government of the newly-acquired territory, and erecting within it four separate colonial governments, called Quebec, East Florida, West Florida and Granada, in neither of which was included the region afterwards composing the Northwest territory. That region was set apart for the exclusive occupation of the Indian tribes then inhabiting it, and the royal proclamation, after forbidding the governors of Quebec or either Florida to grant warrants of survey or pass patents for lands beyond the boundaries of their respective governments, declares it to be the royal will and pleasure "that no governor or commander-in-chief of our other colonies or plantations in America do presume, for the present, and until our further pleasure be known, to grant warrants of survey or pass patents for any lands beyond the heads or sources of any of the rivers which fall into the Atlantic ocean from the west or northwest."

It is further declared to be the royal will and pleasure "to reserve * * * for the use of the said Indians all the land and territories not included within the limits of our said three new governments, or within the limits of the territory

granted to the Hudson's Bay Company, as also all the land and territories lying to the westward of the sources of the rivers which fall into the sea from the west and northwest, as aforesaid; and we do hereby strictly forbid, on pain of our displeasure, all our loving subjects from making any purchases or settlements whatever, or taking any possession of any of the lands above reserved, without our special leave and license for that purpose first obtained." Annual Register, vol. 6, pp. 208–213.

This proclamation remained in force till the statute of 14 Geo. III. c. 83, (30 St. at Large, 549,) known as the Quebec Act, by which the acquisitions from the French, under the treaty of Paris, lying northward of the Ohio river, were erected into a single province called the province of Quebec, and the old French laws of Canada—the customs of Paris— were constituted the jurisprudence throughout the province in civil matters, and the common law of England that in criminal matters; the reason for this being that almost the entire population was French. Hughes' Hist. of England, vol. 2, pp. 123–125; Bancroft's Hist. of U. S. vol. 7, p. 157; Hildreth's Hist. of U. S. vol. 3, pp. 33, 34; Bell's Hist. of Canada, vol. 2, pp. 119–120; Campbell's Polit. Hist. of Michigan, 153.

Up to the time of the passage of the Quebec Act, the region afterwards forming the Northwest territory was undoubtedly destitute of any system of laws whatever. It was virtually empty and uninhabited. A few military and trading posts, and a few scattering settlements of French people, existed here and there upon it, separated by enormous intervals, and wholly insufficient to impose any legal code upon the region at large.

The Quebec Act remained in full force until the signing of the treaty of peace, in 1783, between the United States and Great Britain. By that treaty the latter power relinquished all claim to this region, and the western boundary of the United States was fixed at the Mississippi river. 8 U. S. St. at

Large, 80.   In 1787, the congress of the confederation passed the ordinance of 1787, for the government of the territory of the United States northwest of the Ohio river.   At this time, certainly, no part of the common or statutory law of England relating to civil matters, was in force in the region for which the ordinance provided a government, for (1) that region had but a few years before been ceded to Great Britain by another civilized power, and (2) no colony ever migrated from England to any part of that territory, so as to afford the necessary vehicle for the transportation of such laws.   Nor did such laws acquire any force there by legislative adoption, for another system of jurisprudence was extended over the entire section of country by express statute.   Hence, when the ordinance was passed, the ancient Canadian laws were the legal system regulating civil affairs throughout the Northwest territory, or else it was to be regarded as unprovided with laws.   Congress evidently took the latter view.   The French system of jurisprudence was not to be tolerated as the legal code of any considerable portion of territory.   The extension of that system over the then newly-acquired territory by the Quebec Act was one of the grievances recited in the Declaration of Independence.   The ordinance of 1787, and the other legislation of congress, proceeded on the theory that the region was unsupplied with laws.   By that ordinance, when the population should reach 5,000 free male persons of full age, a legislature was to be organized.   Until such organization the government of the territory was to be administered by a governor and three judges, who, or a majority of them, were commanded by the ordinance to adopt and publish such laws of the original states, both civil and criminal, as might be necessary and best suited to the circumstances of the territory, and to report them to congress from time to time—such laws to remain in force until the organization of the legislative assembly, unless disapproved by congress.   Until laws should be adopted by the governor and judges, the ordinance provided for the descent of the estates of deceased persons,

for the endowment of widows out of the estates of their husbands, that estates might be devised or bequeathed by will, that lands might be conveyed by deed, and personal property transferred by delivery. It further provided that the French and Canadian inhabitants, and other settlers of the Kaskasias, St. Vincents and other neighboring villages, who had professed themselves citizens of Virginia, should retain their own laws and customs then in force, relative to the descent and transfer of property. Had congress supposed that the English common law and the statutes amending it, passed prior to the Revolution—the whole forming a system unsurpassed by any then existing in the world—was already in force throughout the Northwest territory, it would never have embodied in the ordinance the provisional rules as to descent, distribution and transfer of property.

At the first session of congress under the present constitution, the ordinance of 1787 was revived and continued. 1 U. S. St. at Large, 50. Soon afterwards the Northwest territory was organized pursuant to its provisions. No legislative assembly was convened, however, until about 1799, the legislative power remaining meanwhile in the governor and judges, who proceeded to supply the territory with a body of laws, adopted from the systems of the original states. Among other laws they adopted the following from Virginia:

"A law declaring what laws shall be in force. The common law of England, all statutes or acts of the British parliament made in aid of the common law prior to the fourth year of the reign of King James the First, (and which are of a general nature, not local to that kingdom,) and also the several laws in force in this territory, shall be the rule of decision, and shall be considered as of full force, until repealed by legislative authority, or disapproved of by congress. Adopted from the state of Virginia. Published July 14, 1795, to take effect October 1, 1795." 1 Chase's Stat. of Ohio, 190. Through this gateway the common and statutory laws of England first entered the region composing the North-

west territory. No statutes later than 4 James I. were admitted, and none such have ever been in force, except by express reenactment, in any part of that region.

By act of congress passed in 1792, the governor and judges were empowered to repeal as well as to enact laws. 1 U. S. St. at Large, 286.

In 1800, congress divided the Northwest territory into two parts by a line running northerly from the Ohio river, opposite the mouth of the Kentucky river, to Fort Recovery, and thence due north to the British boundary line. The region west of this line was created into the territory of Indiana, and provided with a government similar to that of the Northwest territory under the ordinance of 1787 and the subsequent acts of congress. The Indiana territory comprised the greater part of the present states of Indiana and Michigan, the whole of Illinois and Wisconsin, and that part of Minnesota lying east of the Mississippi river. 2 U. S. St. at Large, 59.

In 1802, congress admitted Ohio into the Union, and attached the remainder of the Northwest territory, as it existed after the division, (being the eastern portion of the lower Michigan peninsula,) to the Indiana territory. 2 U. S. St. at Large, 173.

In 1805, congress created the territory of Michigan, embracing all that part of the Indiana territory lying north of a line drawn due east from the foot of Lake Michigan to Lake Erie, and east of a line drawn from the foot of the former lake, through the middle to the northern extremity thereof, and thence due north to the British boundary line, and provided this Michigan territory with a government like that provided by the ordinance of 1787 for the Northwest territory. 2 U. S. St. at Large, 309.

Until the year 1823, the government of the Michigan territory was administered by the governor and judges, who, in the year 1810, adopted an act, entitled "An act to repeal all acts of the parliament of England and the parliament of

Great Britain, within the territory of Michigan, in the United States of America, and for other purposes." The preamble and first section are as follows:

"Whereas, the good people of the territory of Michigan may be ensnared by ignorance of the acts of parliament of Great Britain, which are not published among the laws of the territory, and it has been thought advisable by the governor and judges of the territory of Michigan hereafter especially to enact such of the said acts as shall appear worthy of adoption; therefore

"*Be it enacted by the governor and judges of the territory of Michigan:*

"That no act of the parliament of England, and no act of the parliament of Great Britian, shall have any force within the territory of Michigan: *provided,* that all rights arising under any such act shall remain as if this act had not been made—the same being adopted from the laws of one of the original states, to wit, the state of Virginia, so far as necessary and suitable to the circumstances of the territory of Michigan." 1 Territorial Laws of Mich. (Ed. 1871,) 900. The force of this repeal became subsequently extended, as will appear, to the entire region of country now covered by the states of Michigan, Wisconsin, Minnesota and Iowa, and that part of Dakota territory lying east of the Missouri river; and such force has ever since continued in the region covered by Michigan, Wisconsin and Minnesota, and most probably in Iowa, and that part of Dakota before mentioned.

In 1809, congress divided the Indiana territory into two parts by a line running up the Wabash river to Vincennes, and thence due north to the British boundary line. The western part was created into a territory called Illinois territory, and provided with a government similar to that provided for the Northwest territory by the ordinance of 1787. 2 U. S. St. at Large, 514.

In 1818, congress authorized the people of that part of the territory of Illinois embraced within the limits of the present

state of Illinois to form a state government; and the remainder of that territory, and of the Indiana territory after the admission of the state of Indiana into the Union, comprising the northern peninsula of Michigan, and the region now covered by the state of Wisconsin and that part of Minnesota east of the Mississippi river, were incorporated into the territory of Michigan. By this act (§ 7) it was provided that the people of the region so incorporated with Michigan territory should "be entitled to the same privileges and immunities, and subject to the same rules and regulations in all respects, with the other citizens of Michigan territory." 3 U. S. St. at Large, 428. Hence the laws of Michigan territory, including the act repealing all British statutes, upon the passage of this act forthwith became in force throughout the new Michigan territory; and such would probably have been the result without any such express provision.

In 1836, congress created the territory of Wisconsin, comprising the region now covered by the states of Wisconsin, Minnesota and Iowa, and that part of Dakota territory lying east of the Missouri river. By section 12 of this act it was provided that the existing laws of the territory of Michigan should be extended over the territory of Wisconsin. 5 U. S. St. at Large, 10.

In 1839, the legislature of the territory of Wisconsin adopted a revised code of laws for that territory. The concluding chapter is entitled "An act to repeal the acts therein mentioned," and sections 1, 2, and 8 of this act are as follows:

"Section 1. All the acts of the territory of Michigan which were in force in the territory of Wisconsin on the fourth day of July in the year one thousand eight hundred and thirty-six are hereby repealed.

"Sec. 2. The repeal of any act by any law of this territory shall never be construed to revive any act previously in force, unless such repealing act shall contain an express provision that any such repealed act shall be thereby revived and put in force.

"Sec. 8. None of the laws of Great Britain shall be con-
sidered law of this territory, nor shall they be deemed to have
had any force or effect in this territory since the fourth day
of July, 1816." St. of Wis. (1839,) 404, 407. The effects
of this act were (1) that the repeal of the British statutes
effected by the act of the governor and judges of Michigan
territory, in the year 1810, was still left in force; and (2)
those statutes were again expressly abrogated.

By the act of March 3, 1849, (9 U. S. St. at Large, 403,)
congress created the territory of Minnesota, and by section
12 of this act, the laws of the territory of Wisconsin were
retained in force in the territory of Minnesota, subject to
modification or repeal by the governor and legislative assem-
bly.

By the Revised Statutes of Minnesota territory there was
a general repeal of all acts of the legislature of Wisconsin
territory. Rev. St. (1851,) *c.* 137, § 1. But it was expressly
provided that no repeal of a repealing statute should have
any effect to revive any law repealed by such statute. Id. §
7. And the General Statutes of the state repealed all acts
of the territory of Minnesota, but with the like qualification.
Gen. St. *c.* 122, § 1; *c.* 121, § 3; *c.* 4, § 3.

Hence, there have been in force in this state, from the first,
(1) the act adopted by the governor and judges of the North-
west territory, in the year 1795, as modified by (2) the repeal of
the British statutes accomplished by the act adopted by the
governor and judges of the territory of Michigan, in the year
1810; and (3) the additional repeal of the British statutes,
accomplished by the act passed by the legislature of the ter-
ritory of Wisconsin, in the year 1839. I have not learned
whether the legislative body of the territory of Indiana, or of
Illinois, adopted any acts defining what parts of the English
common and statutory laws should be in force in those terri-
tories; but the act adopted by the governor and judges of the
Northwest territory, in the year 1795, has been expressly
reenacted by the statutes of the states of Indiana and Illi-

nois, and is still in force in those states.  *Croft* v. *State Bank,*
7 Ind. 220; Illinois Rev. St. (1845,) 337, § 1.

To recapitulate: (1) The English common law and statutes
were first extended over the region of country formerly the
Northwest territory by the act adopted by the governor and
judges thereof, in the year 1795.   (2) No act of the English
parliament passed since the fourth year of the reign of King
James I. (A. D. 1607) has ever been in force in that region
of country, unless by express reenactment.   (3) No act of
the English parliament has been in force in the region of
country known as the Michigan territory, since the enlarge-
ment of that territory in 1818, unless such as have been
merely declaratory of the common law, or such as have been
expressly reenacted.   (4) No act of the English parliament
has been in force in the region of country known as Wiscon-
sin territory, since the creation of that territory, unless such
as have been merely declaratory of the common law, or such
as have been expressly reenacted.

The necessary conclusion is that no statute has ever been
in force in this state granting to the owners of rents the right
to resort to the remedy by distress, in the absence of express
stipulation for that right.

3. The common-law right of owners of rents to distrain
for the non-payment thereof having been abrogated by the
constitution of the state, along with the other incidents of
feudal tenures; and no statute having ever been in force in
this state conferring, by its own act, such right; it must fol-
low that such right can never have existed in any case aris-
ing in this state, unless by the act of the parties.   The
common law has always permitted the tenant of lands out of
which any rent is reserved to contract with the owner of the
rent that the latter might resort to the remedy by distress, in
case the rent so reserved should remain unpaid; and such a
stipulation in instruments reserving and granting rents has
always been common in England and this country.   Hence,
since the adoption of the common law by the governor and

judges of the Northwest territory, in 1795, it has been perfectly lawful for every lessor of lands within the region now forming the state of Minnesota, to reserve in his lease the right to distrain the tenant's chattels on his failure to pay the rent—at least until the act of 1877, (Laws 1877, c. 140,) abolishing the remedy entirely. The same is true of the state of Wisconsin—at least until the time of the passage of a similar act in that state.

4. In the case of *Coburn* v. *Harvey*, 18 Wis. 147, it is apparent that the treaties, acts of parliament and of congress, the acts of the governor and judges of the Northwest territory and of Michigan territory, and the acts of the territorial legislature of Wisconsin, were entirely overlooked by the counsel, and the case is treated as if the state of Wisconsin had originally been an English colony, organized under royal charter, and was without any further history. The questions before the court were questions of fact—historical questions, to be solved by the historical method; but the court attempted to solve them, almost exclusively, by a mere process of reasoning. The court would never have held that acts of the English parliament down to the time of the American revolution were in force in Wisconsin, if it had not overlooked the facts that no such act later than the statute 4 James I. had ever been in force in the country embraced in that state, and that all such acts had been twice expressly repealed by competent authority.

And the court must have overlooked the origin and nature of the common-law remedy by distress for non-payment of rent. One of the chief grounds of the judgment is that the legislature of Wisconsin territory had expressly recognized the existence of the remedy by distress. The statute relied on was a chapter of the Revised Statutes of the territory, passed in 1839, relating to proceedings in replevin. Certain sections of that statute merely defined the course of procedure in cases where the chattels replevied had been distrained for non-payment of rents. But neither those sections nor any part of the statutes of the territory allude to the way in which the right

to distrain could be acquired by the owner of rents. All that the sections amounted to, at the uttermost, was a mere recognition of the fact that cases might arise in the territory where chattels had been lawfully distrained for non-payment of rent. But that was of no consequence in the case before the court, unless the right to distrain could be conferred only by act of the law; and the court must have thought that the remedy could arise only in that way. For if the right could arise in any other way, the fact that the legislature recognized that it might arise in some way would not show that body to have considered that it might arise by act of law, and the argument from legislative recognition would break down entirely. And as it has always been the law in the territory and state of Wisconsin that the right to the remedy by distress could be created by express reservation of that right in the instrument reserving the rent, a statute regulating proceedings in replevin for chattels distrained for non-payment of rent was a needful and proper law within that territory and state; and the enactment of such a statute would have no tendency whatever to prove that the legislature was of opinion that the right to distrain could arise by the mere act of the law. And, certainly, the legislature that adopted the replevin act of 1839 could not have intended to recognize the right of anybody to distrain under the statutes of William & Mary and George II., since, in the same code of laws, it expressly repealed those and all other British statutes.

5. The provision in the acts of the territory and state of Minnesota, (Rev. St, *c*, 70, § 39; Gen. St. *c.* 66, § 38,) that actions to recover personal property distrained for any cause shall be tried in the county in which the subject of the action, or some part thereof, is situated, affords no basis for an argument that the legislature has ever recognized a right to distrain, conferred by mere act of law. The section makes no allusion to distress for non-payment of rents, but speaks of distress generally; and, from the first, under the laws of the territory and state, there have existed several kinds of

distress, as of beasts doing damage, of property for non-payment of personal taxes. These several sorts of distress would account for the passage of the clause in question. Besides, what has been said as to the remedy by distress for non-payment of rents in Wisconsin, is equally true and applicable in Minnesota. Until the act of 1877, the right of resorting to that remedy had always been capable of existing in every case by express reservation; and to that extent, and in that way, the remedy by distress had always been lawful here.

*C. K. Davis*, for respondents.

1. Under the feudal system all rent was rendered by services either military or of a pacific character. 3 Kent, 485; 2 Bl. Com. *c.* 4–6. Such terms finally became hereditary. Taylor Land. and Ten. § 4. From this the tenant's right of alienation was made inevitable, and therefore, by the statute of *Quia Emptores*, (18 Edw. I. *c.* 1,) every freeholder was empowered to alienate, and his grantee was required to perform the services by which the grantor held. 1 Washb. Real Prop. (3d Ed.) 43, 44. By this time the military features of the feudal system had become subordinated to the innovating forces which have produced our civilization. Standing armies superseded the feudatory levies, and by necessity the personal services by which rent was once paid were commuted by paying a certain sum of money to the owner of the fee. Rent thus paid retained the name of that for which it was substituted, rent service. The compulsory remedy of the reversioner survived this change, and was by distress. Littleton's Tenures, (Tomlins' Ed.,) 242, 243, 246. Wherever rent was reserved to a reversioner, the right to distrain was an incident to the reversion. This right survived the abolition of homage and fealty. With these changes the system of taxation by the state—the lord paramount—began to be a factor of political administration, and this remedial common-law right has survived in the practice of distraining for taxes in arrear.

Rents charge, where there was no reversion to the grantor, were distrainable by reason of a reservation in the deed,

empowering the grantor and his heirs to distrain. Tomlins' Littleton, 252. Rent seck was not distrainable, because there was no such reversion, and no reserved right of distress in the deed. 3 Kent, 461. The rent in question in this case was, therefore, a rent service, and enforceable at common law by distress.

The right to distrain for rent of this character was confirmed by the statute 4 Geo. II. *c.* 28, § 5, and existed in Virginia, notwithstanding the abolition, in that state, of feudal tenures in 1779. 1 Lomax Dig. 693, 702–3.

2. This right was not destroyed by section 5, article 1, of the constitution of Minnesota. Although, by that article, feudal tenures are abolished, and all lands are declared to be allodial, it is plain that these provisions apply only to estates in fee, for in the same article, leases for which rent and service are to be rendered, are provided for. *Minneapolis Mill Co.* v. *Tiffany,* 22 Minn. 463.

3. This court was correct in holding that "the common law of a state which had no political existence before the revolution is the common law as amended and modified by the English statutes passed prior to our revolution." Cooley Const. Lim. 21–25; *Com.* v. *Leach,* 1 Mass. 60; *State* v. *Rollins,* 8 N. H. 550; *O'Ferrall* v. *Simplot,* 4 Iowa, 399; *Coburn* v. *Harvey,* 18 Wis. 147; *State* v. *Pulle,* 12 Minn. 164; *Blackman* v. *Wheaton,* 13 Minn. 326.

The history of the Northwest territory demonstrates that the common law was imposed upon that region, with a few specified exceptions, by Great Britain, and by every colony and state which ever laid claim to that immense region.

There was for a long time much controversy as to the rights of those colonies and states over this territory, under the royal charters which were issued to Massachusetts, in 1606; to Virginia, in 1609; to Connecticut, in 1662; and to New York, in 1664. After the cession by France to England, by the treaty of Versailles, concluded in 1763, these disputes were frequent and insoluble. The claim of Virginia was much

strengthened by the fact that, in 1778, Patrick Henry, as gov-
ernor of that state, organized an armed force, which, under
General Clarke, captured the English posts of Kaskaskia, on
the Mississippi, Vincennes, on the Wabash, and so completely
annihilated the British power in that region that it did not
again there manifest itself during our war for independence,
except at Detroit. This conquest "confirmed Virginia's claim
to the possession of the country, and had its due weight in
the final negotiations" which resulted in the cession of this
territory by the four states, to the United States. Parton's
Jefferson, 234.

The ordinance of 1787 can be fairly held to have established
the common law in the Northwest territory. At the very least,
it assumed its existence, and confirmed it. It abolished the
right of primogeniture, which existed in Virginia at the time
of the cession, and which was not abrogated in that state until
1787. These facts, with others to be mentioned, tend to show
that Virginia was the proximate source of the common law of
the Northwest territory.

By the ordinance of 1787, the governor and judges were
empowered to adopt, publish, and report to congress, such laws
of the original states as might be necessary and best suited to
the circumstances of the district. In 1795, they adopted, as
their first exercise of this power, an act from Virginia, which
had been repealed, by which they provided "that the common
law of England, and all the statutes and acts of the British
Parliament made in aid of the common law, prior to the fourth
year of King James the First, (and which are of a general
nature, and not local to that kingdom,) and also the several
laws in force in this territory, shall be the rule of decision,"
thus assuming that there were laws in force other than those
expressly adopted. Fraser's Introduction to Territorial Laws
of Michigan, 12. This author states that the authority of
the governor and judges to pass this act was doubted, be-
cause, *first*, it was an attempt to adopt the whole jurispru-
dence of a foreign country; and *second*, the statute was not

an existing law of Virginia. In 1810, these functionaries attempted to repeal all the statutes of Great Britain. In this they clearly transcended their powers, for the reason that the ordinance of 1787 and its amendment gave them no power to repeal those statutes. However this may be, the statute contained this proviso, "that all rights arising under any such act (of parliament) shall remain as if this act had not been made: the same being adopted from the laws of one of the original states, to wit the state of Virginia, so far as necessary," etc. 1 Terr. Laws of Mich. 900.

The statutes of William and Mary and of George II., respecting distress for rent, were part of the law of Virginia, either by adoption or colonial enactment. The charter granted by James I. to the proprietaries gave them full power of government. Their laws were required to be not contrary to the laws of England. The proprietaries constituted, for legislative functions, a general assembly and council of state, and enjoined them "to imitate and follow the policy of the form of government, laws, customs  *  *  *  used in the realm of England." Stith's Virginia, Appendix, 32, 33. In 1748, it was enacted that "rent of every kind may be recovered by distraint or action." Hening's Statutes. *Ferguson* v. *Moore*, 2 Wash. (Va.) 68, decided in 1795, arose out of a distress for rent, and in that case, the statute of 4 George II. is cited as in force. See also *Smith* v. *Smith*, 1 Munford, 596; *Anderson* v. *Winston*, Jeff. Rep. 24.

Notwithstanding the conquest of this region during the revolution, Great Britain, from and after the treaty of 1782, reoccupied a great portion of it, and did not surrender it until July, 1796  In 1792, the legislature of Upper Canada, of which province Michigan was claimed as part, enacted a statute by which the laws of Canada were repealed, and which provided that "resort shall be had to the laws of England as the rule for decision in all matters of controversy relative to property and civil rights." Common-law courts were established. All statutes of jeofails and of limitation were adopted.

Every English statute "for the amendment of the law" was adopted. Courts were held at Detroit, which administered the common law thus adopted, down to January 29, 1796.

Although the inquiry how the common law became the law of the region comprised in the Northwest territory has been characterized as "more curious than useful," (*Lorman* v *Benson*, 8 Mich. 18,) the question is a practical one in this case. Enough has been adduced to show that from every direction in which civilization advanced westward and northward, whether from Canada or from Virginia, it bore with it the common law and the statutes amendatory thereof. Reenactment by territories or states was not required. In many respects, besides the right to distrain, the common law and amendatory statutes are in force here without reenactment.

Promissory notes were made negotiable in 1705 by the statute of Anne, in consequence of the decision of Lord Holt in *Clerke* v. *Martin*, 2 Ld. Raym. 757, who declared that the effort to make them negotiable "proceeded from the obstinacy and opinionativeness of the merchants, who were endeavoring to set the law of Lombard street above the law of Westminster Hall." No statute has ever been enacted in Minnesota making promissory notes negotiable.

By the statutes of 6 Anne and 14 Geo. III. a tenant is made not liable, in the absence of a covenant to rebuild, for the accidental destruction of the premises or adjoining premises, by fire. These statutes are common law in this country, though they have never been enacted here. *Wainscott* v *Silvers*, 13 Ind. 497; *Lansing* v. *Stone*, 37 Barb. 21; Taylor Land & Ten. § 196.

It was held (though a historical error, as subsequent discoveries demonstrated,) by the supreme court of the United States, in *Baptist Association* v. *Hart's Executors*, 4 Wheat. 1, that the statute of 43 Elizabeth is the original of the authority in courts to hold charitable devises, void at law, valid in equity. Were this historically true, would our courts be ousted from that vast and beneficent jurisdiction, simply

because the statute of Elizabeth has not been adopted here by enactment?

BERRY, J. Upon this motion for a reargument it is insisted that, in holding, in the opinion filed in this case, that a landlord's common-law right of distress for rent in arrear existed in this state, the court erred, because this right of distress was an incident of feudal tenure, and by section 15, article 1, of our state constitution, "All lands within this state are declared to be allodial, and feudal tenures of every description, with all their incidents, are prohibited."

As respects this ground of the motion for reargument, we are of opinion that, independent of express contract, the right of distress for rent originally existed at common law only in favor of a reversioner as an incident of a feudal tenure, but that, in process of time, the common law was so far changed, both directly and consequentially, by legislation, and notably by the act of 4 Geo. II. *c.* 28, § 5, as to extend the remedy to every species of rent, whether accruing under a feudal tenure or not, and that, as a result, the right of distress ceased to be an incident of feudal tenure, and became an incident of the relation of landlord and tenant. But it is claimed that the act of 4 Geo. II. has never been in force in this state, and the same claim is made with reference to the act of 2 Wm. & Mary, *c.* 5, referred to and relied upon in the before-mentioned opinion of this court. Both of these acts are statutes amendatory of the common law of distress for rent in arrear, and, of course, both were passed long before our revolution. In the opinion heretofore filed in this case, it was held that the act of Wm. & Mary is in force in this state, upon the ground that the common law of a state which had no political existence before the revolution is the common law as modified and amended by English statutes passed prior to the revolution. This general proposition, it was remarked, has no reference to such portions of the common law, or of its modifications or amendments, as are inappli-

cable to a given state, or to changes or repeals of the same effected by the legislation of such state. We are still of opinion that this is sound doctrine. At the time when the region of country, subsequently known as the Northwest territory, came into the possession and control of the United States, it was, in general, a vast wilderness, inhabited by savages, who had certain manners and customs, but no form of government nor any system of law. A like state of facts existed in almost all of the region known as the Louisiana purchase, and certainly in the whole northern portion of it. There was, in fact, no operative system of law there, since, with exceptions too trifling to be entitled to any weight or consideration, there were no people there upon whom laws could operate. Nevertheless, there was a general law of the land, sometimes, and with great propriety, denominated the American common law.

Upon this topic, Mr. Justice Cooley says: "From the first, the colonists of America claimed the benefit and protection of the common law. In some particulars, however, the common law, as then existing in England, was not suited to their condition and circumstances in the new country, and those particulars they omitted as it was put in practice by them. They also claimed the benefit of such statutes as from time to time had been enacted in modification of this body of rules. * * * While colonization continued—that is to say, until the war of the revolution actually commenced, * * * * the changes made in the common law were operative in America also, if suited to the condition of things here. * * * * When, therefore, they emerged from the colonial condition into that of independence, the laws which governed them consisted, *first*, of the common law of England, so far as they had tacitly adopted it as suited to their condition; *second*, of the statutes of England or of Great Britain, amendatory of the common law, which they had, in like manner, adopted; and *third*, the colonial statutes. The first and second constituted the American common law." Cooley's Const. Lim. 22–25.

In the circumstances of the vast regions of country spoken of, the good sense of the case seems to us to be this, viz., that, as from time to time different portions of them became settled by inhabitants who had been brought up under, and were therefore accustomed to, a government of laws, and who required laws, the American common law, as it is defined in the opinion of this court in this case substantially in accordance with the views expressed by Mr. Justice Cooley in the passages quoted, became operative as law. This American common law was the general law of the land, and those who colonized the regions spoken of may justly be said to have found it there in abeyance, as it were, awaiting subjects upon which to operate.

What we have said is, of course, independent of the effect of the ordinance of 1787, and the act of congress continuing the same in force and effect. We have been referred by counsel to sundry acts adopted by the governor and judges, who were invested with certain legislative authority under the early territorial organizations, and also to an act passed by the legislature of the territory of Wisconsin, in 1839. (Stat. of Wis. 1839, 404–7.) As to the repeal of the acts of the parlia· ments of England and Great Britain, attempted by the former, there is certainly room for great doubt as to the authority of the governor and judges to enact any such repeal. But, irrespective of this, we do not think that the repeal thus attempted, or the repeal of the statutes of Great Britain, by the act of 1839, by the legislature of Wisconsin, are entitled to be considered as extending to such statutes as were amendatory of the common law. It is not reasonable to suppose that it was intended to restore the common law as it was before it was ameliorated by these amendments; yet, in many if not all cases, this unhappy consequence would appear to follow, if these amendments were intended to be embraced in the repealing acts mentioned.

Our opinion is, that the acts mentioned referred to English and British statutes other than those amendatory of the

common law. It must be admitted that there is no little difficulty in determining precisely what is meant by this legislation. But, certainly, it has not been understood, either in Michigan or in Wisconsin, from and through which, while territories, our system of law was, to a very great extent, derived, that the statutes of parliament amendatory of the common law had been swept away. On the contrary, the American common law, including, as before said, statutory amendments thereof passed prior to the revolution, has, in each of those states, been recognized by its highest judicial tribunal as existing in full force. *Stout* v. *Keyes*, 2 Doug. (Mich.) 184; *Lorman* v. *Benson*, 8 Mich. 18; *Coburn* v. *Harvey*, 18 Wis. 147. See, also, *O'Ferrall* v. *Simplot*, 4 Iowa, 399. This is a consideration of great weight, especially as showing the general and common understanding. We hazard nothing in saying that a like understanding has generally prevailed in this state.

Upon this motion for a reargument, the grounds of the reargument asked for were, and were understood to be, fully presented, as if a reargument had been allowed. As it appears, from what we have said above, that our views are unchanged, and that we adhere to the opinion heretofore filed in the case, it follows that the motion for a reargument must be denied.

Ordered accordingly.