JOHN McDANIEL v. RILEY McCOY ET AL.

*Equity—Bill to set aside deed for fraud—Mental incompetency.*

1. It has never been held that a complainant not under guardianship may not file a bill, by solicitor and counsel, for relief, and courts of equity, instead of dismissing such bills, usually take some pains to see that the rights of a weak-minded party shall not be sacrificed.

2. Cases like the present depend so much upon their own facts that it is of little use to attempt to measure them by exact precedents, and the equitable rules which protect old and feeble-minded or insane persons from being spoiled of their property are familiar, and not technical.

3. Without attempting to measure the exact boundaries in the record between actual and constructive fraud, we think none of the transactions relied upon by the defendants, whether con-

nected with the deed or the alleged settlement, were the legal acts of the complainant; which deed is set aside and declared null and void.

Appeal from Cass. (Smith, J.) Argued January 19 and 20, 1888. Decided January 26, 1888.

Bill to set aside a deed. Decree dismissing the bill reversed, and decree entered granting the relief prayed for. The facts are stated in the opinion.

*E. L. Hamilton* and *O. W. Coolidge,* for complainant.

*Spafford Tryon (Harsen D. Smith,* of counsel), for defendants.

CAMPBELL, J. Complainant filed his bill to set aside a conveyance alleged by defendants to have been made in August, 1882, to his daughter, and their mother, Sarah McCoy, wife of John McCoy. Complainant rests his claim for relief on actual and constructive fraud. Defendants, whose mother died a little more than a year after the date of the conveyance, set up in defense, not only the legal validity of the deed, but the further fact that, in November, 1884, a bill similar to the present one was filed, and was finally settled by the execution of a life-lease to the complainant, and a release by him of further claims to support from defendants and their father. The court below dismissed the bill, but without prejudice to proceedings by his heirs hereafter. This would seem to indicate that complainant was supposed to labor under some disability to sue, as otherwise what would bind him would bind his heirs. But it has never been held that a complainant not under guardianship may not file a bill, by solicitor and counsel, for relief. Many such cases appear in our own records, and courts of equity, instead of dismissing such bills, usually take some pains to see that the rights of a weak-minded party shall not be sacrificed. Cases like the present depend so much upon their

own facts that it is of little use to attempt to measure them by exact precedents. The equitable rules which protect old and feeble-minded or insane persons from being spoiled of their property are familiar, and not technical. The facts in the present case are contradictory, and we must determine as well as we can where the true equities lie.

Complainant, now an old man of about 84 or 85 years of age, had lived on a valuable 80-acre farm, in Cass county, for a great many years, and his family had grown up, and part of his children were dead, with or without issue, and part had left the neighborhood or the State. In 1881 his wife was dead, and he was living on his farm, and he had some years before been in bad health, and had never entirely regained his strength. The daughter, Mrs. McCoy, to whom the deed was made, lived near. In 1881 he was removed—as he says unwillingly, and as defendants claim willingly—to Mr. McCoy's, and his farm was worked by others. He carried a pretty large sum of money with him to McCoy's, which seems to have gone in some way which he cannot account for. Until 1884 he never went away from McCoy's to stay or visit, and it is not clear that he ever left the house at all. McCoy received the proceeds of his farm and of some of his stock, and claims to have paid the money over to the old man, who denies any such payment. During his daughter's life complainant appears to have been reasonably content with her treatment, and makes no charge that she was not kind, as we have no doubt she was. After her death he claims to have been badly treated and neglected in a scandalous way. But this subsequent treatment, whatever it was, has no immediate bearing on the deed itself, although relevant to some other aspects of the case.

Sometime in 1881 a will was drawn by Mr. Schermerhorn, a justice of the peace, who did not know him personally. This is said by the witnesses to have left his realty to Sarah. Complainant is unable to read or write, and the contents of

these papers, if he knew them, were communicated to him by others. In August, 1882, Mr. McCoy procured Schermerhorn to come to his house and make the deed in question. This he claims to have done at complainant's request, because, as he represented, he was afraid the will would not stand. Schermerhorn says he had a conversation with complainant to the same purport, and expressing a desire to provide for Mrs. McCoy as the only child that had served him properly. According to Mr. Schermerhorn the consideration was fixed at $3,000 as not far from the value of the farm, and complainant made the deed, as he said, because his daughter had cared for her mother before her death, and he expected to make his home with her for the rest of his life.

Complainant claims that he was induced to sign, or rather to affix his mark to, the paper without understanding it was a deed, but for another purpose, and that he never knew it was a deed till afterwards. It was recorded the same day, McCoy making a special errand to get this done, at Cassopolis, late in the day, and, as he says, at complainant's request. Complainant denies this altogether. One of defendants, who was a witness, as she says, of the transaction, gives the old man's reason for hurrying up the record as a fear that something might be recorded ahead of it. Such a reason is ridiculous, and, if really given, would be strong evidence of lack of competency in the grantor. But no one else gives it, and it is not plausible. The only danger that would make speedy record desirable was that the old man might convey to somebody else; and no sane man would suggest such a danger against himself.

At his daughter's death the next year, complainant did not see her, and some of defendants' witnesses say he would not do so, but that after the body was removed he wanted to see her. After this he moved, or was removed, into a bed-room near the sitting room, where he continued, according to the testimony for the defense, to spend his time constantly, and

with very few, if any, intermissions, lying on a bed which was filthy in the extreme, not allowing himself to be cleaned or decently dressed, until the bed and himself became intolerably noisome. The testimony for complainant indicates that he was subjected to this vile experience by the neglect of McCoy and his family. They claim that it was his own ugliness and obstinacy which led him to continue in this brutish and unclean way, and that day and night, both when alone and when any one was near, he would curse and swear and pound on the wall at all hours of the night, and resist all attempts to dress or cleanse him. In November, 1884, he was removed by a man sent by the judge of probate, and carried to another place. The person who removed him says he showed intense joy at his deliverance, manifesting it by shouts and ejaculations. Soon thereafter, by the action of a son who had come from a distant state and intervened in his interest, actually or apparently, the suit before referred to was begun to rescind the deed.

In the conflict of testimony concerning this deed it would not be profitable to set forth the testimony at large. Much of it is of small account, and many things are unexplained. But we have become convinced of some decisive facts, and will refer to them briefly.

We think it clearly shown that three or four years before his removal to McCoy's he had become affected by some bodily maladies which also impaired his mental powers, and, while not producing what is popularly known as "craziness," had brought about a condition which the medical witnesses agree in regarding as the *dementia*, or mental disorder, frequently attacking the faculties of old persons, and known as *senile dementia*. We are not entirely satisfied that this had gone far enough to destroy his capacity to attend to his ordinary farm concerns, but there are facts in the case indicating that he could not do even this very safely; and if there was an honest intent in McCoy, as there probably was in Mrs.

McCoy, in his removal to their house, it is evident that it was because it was thought he needed looking after as practically incompetent. It is easy to see that during Sarah McCoy's life he did not live or act at all as men do who own property, or mean to look after it. Although the testimony is meager during this period, it indicates not very much more than an animal existence, so far as any activity is concerned, and when witnesses speak of the sufficiency of the care bestowed on him it goes very little further. If the testimony is believed of his conduct at Sarah's death, it is entirely inconsistent with the affection which it is claimed he bore to her, and equally inconsistent with the idea that he was regarded as having the usual attributes of decent humanity. The defendants' testimony concerning his conduct and ways during the subsequent period of his life in that house not only indicates a loss of all the self-control and restraint which characterizes every decent person, but shows just as plainly that he was considered by the household as not much, if any, better than a beast. This state of things is more significant than anybody's subsequently formulated opinions. It shows that the unfortunate state into which he had fallen was not altogether new, nor much more aggravated than might fairly be traced to his former deficiencies, as worked upon by want of sympathy and attention. The testimony shows that he was now and then rational in his talk, and on such occasions exhibited no more mental weakness than garrulousness, and lack of memory, and some incoherence. His removal from McCoy's seems to have been followed by a decided improvement, which is visible in his testimony, but which does not show him fit to dispose of his property.

The real occasion for the making of the deed in August, 1882, is not shown, and can only be conjectured. Sarah McCoy is dead, and all the other witnesses, except Schermerhorn, who pretend to any full knowledge, are interested, actually or by feeling, in sustaining it. It is incredible that

68 MICH.—22.

the grantor, if sane, should have meditated and determined on this step without some further explanation of his purpose and reasons. To be told that he sent for a justice and wanted to convey to his daughter is not an explanation of the facts. Schermerhorn was not only a stranger, but he had no knowledge, according to what we infer from his testimony, which would put him on his guard as to the necessity of vigilance. It is quite as likely that he has not remembered, because he had no such suspicions, from whom all the explanations came, and may have confounded what was said by others with what was said by complainant. It is not necessary to assume any intentional misconduct on his part. But if complainant was the person from whom he received instructions, he certainly did not carry them out. It was his business to embody the entire arrangement in the papers, and complainant's inability to read made this the more necessary. According to his own statement the consideration of the deed was not only past, but future, support and care from Sarah, and not from any one else. If it had been proposed to him to depend on his son-in-law or Sarah's children for future care, there is no hint anywhere that he would have conveyed on such a basis. But no consideration but a money one, of much less than the real value of the land, was inserted, and there were no papers drawn and no terms agreed upon for the future care of complainant, by Sarah or any one else. There is no proof whatever that there was even a verbal promise from any one. The house was not Sarah's, but her husband's, and she could not control the household. These things indicate plainly that there was no complete agreement, and that the deed did not embody the old man's purposes at all. A deed made under such circumstances by an ignorant man, in old age and feeble, even if of sane mind, could not be sustained without doing injustice. The fact that he executed it is not consistent with the exercise of mental capacity, free from influence or misunder-

standing, and if he was given to believe that this deed carried out his views he was deceived.   But, taking all the testimony together, we do not think the deed was the understood act of complainant at all, or that he was fit to make it.

It is testified by physicians, and is consistent with experience, that any serious diminution of mental powers due to old age is not likely to be recovered from to any considerable degree.   The record shows, we think, that while there has been a great improvement, now and then, in the behavior of complainant, he is weak and easily handled by those who seek to influence him, and is fickle and unsettled in his purposes.   If the deed of August, 1882, was really understood by him to be a deed, it is plain enough that he did not use any sense in making it, and did not understand its effect on his own affairs.   But his denial of such understanding is not only corroborated by his own conduct, but is somewhat confirmed by John McCoy's testimony that he received and accounted to complainant for the proceeds of the crops on his farm a year and more after the deed.   There is no pretense that, if this deed was the act of complainant, he retained any interest in the farm.

If complainant was incompetent to make the deed understandingly, the subsequent transactions purporting to be a settlement are no better.   But when we look at the facts, it is manifest that complainant had no real part in it.   Although a suit was begun to rescind the deed, it was managed by complainant's son throughout, and Mr. Howell, the counsel who began it, never saw complainant at all.   This does not look very much like treating him as competent.   The settlement by Mr. Howell, whereby a life-lease was given to complainant, and he released John McCoy and his family from supporting him, was closed without consulting complainant at all in its preparation, and put him in a position of no special advantage to himself.   The testimony of the sewing-machine agent

who dealt with him is not satisfactory. We have no idea that he took any intelligent part in it. We do not care to dwell on the alleged facts and contradictions in the narrations. No man supposed to be of sound mind would have been made such a mere puppet in dealing with his interests.

Without attempting to measure the exact boundaries in the record between actual fraud and constructive fraud, we think none of the transactions relied on by defendants, whether connected with the deed or the alleged settlement, were the legal acts of complainant. We think the deed should be set aside, and declared null and void. The record gives us no sufficient means of determining how far his other property has been misappropriated, and the bill does not ask relief concerning it. The decree must be reversed, with costs, and a decree made in accordance with what has been now announced.

It is to be hoped that he will be better looked after in future.

The other Justices concurred.