## LANDIS v. SMITH.

DEEDS—SETTING ASIDE—FRAUD—EVIDENCE.

Evidence that the grantor in a deed of property worth about $1,500, for a specified consideration of $1,800, was old and of weak memory, and that the grantee actually paid only $5 down, and failed to secure the balance by mortgage on the property as had been contemplated, and that the grantor was induced to convey by fear as to the outcome of a suit brought against the grantee, who was his tenant, by a third person, to oust him from possession,—justifies the setting aside of the deed.

Appeal from Kent; Grove, J. Submitted April 16, 1897. Decided June 28, 1897.

Bill by John Landis against Amanda C. Smith to set aside a deed alleged to have been procured by fraud and undue influence. From a decree dismissing the bill, complainant appeals. Reversed.

*Dwight Goss*, for complainant.

*Charles A. Watt*, for defendant.

Grant, J. Complainant filed a bill to set aside a deed made by himself to defendant, claiming that at the time of executing the deed he was in poor health, and did not realize the force and effect of the instrument he signed, or the intent and purpose for which the same was executed, and that the same was not his free act and deed. The bill further avers that defendant represented that, if complainant did not give the deed, one John R. Watts, who was occupying the land and cultivating it, would cheat complainant out of it. The answer denies the allegations in the bill, admits that the consideration named in the deed was $1,800, but denies that there was no consideration given for the deed, denies that it was obtained by fraud and undue influence, and that it was an unconscionable bargain, but, on the contrary, avers that there was a good and valuable consideration for the same. The circuit judge dismissed the bill on the ground that there was no evidence of undue influence or persuasion, that the complainant voluntarily made the deed, although the circuit judge stated that the complainant impressed him as a man whose memory of past events was very weak indeed.

The case is peculiar, in that it rests so largely upon the testimony of complainant, who has shown himself to be a man of weak memory; but the following facts are gleaned from other testimony: The land in question is worth $1,500. Complainant regarded it as worth $1,800. There had been talk between complainant and defendant of complainant's deeding the land to her, some time before the deed was made. Complainant called upon one

Thomas, a conveyancer, and wanted a deed of the land
and a mortgage back prepared. This Thomas promised
to do when the weather cleared up, and it was warm
enough, agreeing to come to complainant's residence to
do so. It does appear in the testimony that there was a
disagreement between Watts, who occupied the house on
the premises, and the defendant and her husband, who
also occupied a house on the same 40; and we have no
doubt that this was one of the incentives for the com-
plainant's making the deed. Taking it as established that
the complainant was mentally weak, the testimony of
defendant is significant. She testified as follows:

"*Q.* Do you remember when this deed was given to
you by Mr. Landis,—the 40 acres of land there where
you live? Do you remember when you got the deed?

"*A.* Yes, sir.

"*Q.* Whereabouts— Who drew it?

"*A.* Mr. Palmer.

"*Q.* How did you come to go there to have the deed
drawn?

"*A.* Why, he wanted to go.

"*Q.* Did you ever talk with him personally about his
giving you a deed of that place?

"*A.* No, sir; I did not.

"*Q.* When was the first time he ever spoke to you
about making out a deed to you for that 40 acres?

"*A.* Well, I think it was—oh, maybe four or five
weeks before the deed was made.

"*Q.* What was said at that time by him to you?

"*A.* Well, he said he thought he better deed it to me.

"*Q.* Were you having some trouble with Mr. Watts at
that time?

"*A.* Mr. Watts served papers on me to move away
from there.

"*Q.* You live on the same 40 acres that he lives on
there?

"*A.* Yes, sir.

"*Q.* Two houses on the 40, are there?

"*A.* Yes, sir.

"*Q.* Mr. Watts was trying to put you off the place?

"*A.* Yes.

"*Q.* Did he talk more than once to you about giving
you the deed?

"*A.* Why, yes.   He came up there frequently, and said we had better go and have it made out.

"*Q.* What did you tell him?

"*A.* Why, I told him I would go at any time, and he said at any time that I was ready we would go.   *   *   *

"*Q.* What did he say to you?

"*A.* He said we ought to go there and have it done, and have the deed made.

"*Q.* What did you tell him?

"*A.* I told him we would go this afternoon if he wanted to go, and he said he was ready to go at any time that I was.   *   *   *

"*Q.* Was there anything said— Who did the talking at Mr. Palmer's when the deed was drawn?

"*A.* He did the talking.

"*Q.* Was anything said there about your giving a mortgage back?

"*A.* No, sir.

"*Q.* Did he ever ask you for a mortgage?

"*A.* He talked about it one day after he had been up to Mr. Thomas'.

"*Q.* What did he say?

"*A.* He said that Mr. Thomas advised him to have a mortgage back.

"*Q.* How did he come to give you a deed, or make the deed to you?   What did he say?   Tell the court the words that he used, as near as you can.   What reason did he give for wanting to give you the deed?

"*A.* Well, when Mr. Watts served papers on me I saw him down in the road.   I went down the road, and I met him.   I stopped, and talked with him, but I didn't say anything about this case.   I didn't know as he knew anything about it.   And he says, 'Mr. John Watts is trying to make you trouble, isn't he?'   And I said, 'It looks that way.'   He said, 'I don't see how he can.'   He says, 'He has no right to,' and he said that he didn't see why George Thomas should make out the papers for him, or what he did it for; and he said he would have to look into it a little; and I told him he need not worry about it; and that was all there was said then.

"*Q.* State any other conversation that you had with him after that, or that he had with you, in regard to making the deed.

"*A.* Well, just when he told me that he thought he had better deed it to me—

"*Q.* What did you tell him?

"*A*. I didn't say anything at that time. He said, "I guess I better deed the place to you.' * * *

"*Q*. Was there anything said about selling the place, or just giving you a deed of it?

"*A*. Yes, he.talked of selling it to us.

"*Q*. What did you tell him then?

"*A*. He asked me if I wanted to buy it, and I told him I would like to buy it well enough if I could.

"*Q*. What did you tell him about the pay?

"*A*. But I told him that of course I didn't know. We couldn't pay very much down. Well, he said that whatever I could pay it would be all right.

"*Q*. Since the deed was made, has he ever asked you for any money on this place?

"*A*. No, sir.

"*Q*. Did he talk with you when you went over to, Mr. Palmer's? Did you talk the matter over in regard to the conditions on which he would let you have the place?

"*A*. There was nothing said, only he said, 'I guess I don't want any mortgage.'· * * *

. "*Q*. And Mr. Palmer testified that you paid him some money there at that time?

"*A*. I did.

"*Q*. How much did you pay him?

"*A*. I paid him five dollars.

"*Q*. How did you come to pay him five dollars?

"*A*. That was all I had, and he said whatever I could pay would be all right. That was all I had at that time. * * *

"*Q*. You say you paid him five dollars at that time?

"*A*. I did.

"*Q*. How did it come that the consideration named in the deed was $1,800?

"*Mr. Wigent:* The deed is the best evidence.

"*A*. Well, that was what he wanted for the place.

"*Q*. And $1,800 was put in at his suggestion?

"*A*. Yes, sir.

"*Q*. Well, as a matter of fact, is this five dollars all the money you have ever paid on that $1,800 for that place?

"*A*. That is all the money I ever paid; yes. * * *

"*Q*. What did you say to him when he asked you to deed it back before the suit was commenced?

"*A*. Well, I asked him the reason, and he said— Well, he said he thought that and the 80 would make

a good farm. Well, I says, 'You had it long enough; you ought to have thought about that before.' * * *

"Q. You testified that he spoke about a mortgage after he came back from Thomas', and before he made the deed?

"A. When he came back from Thomas'—that was before the deed was made out—he said that Mr. Thomas advised him to have a mortgage, and he asked me if that was all right.

"Q. And what did you tell him?

"A. I told him yes.

"Q. Did he say anything about a mortgage when you went to Palmer's?

"A. Yes. When we were going he said, 'I guess I don't want any mortgage.' * * *

"Q. How did he come to name $1,800 as the consideration for this deed? Do you remember about that?

"A. Well, he thought that it was worth that.

"Q. Is the 40 actually worth $1,800 now?

"A. Well, I don't know; that is what he thought.

"Q. What is your judgment about it?

"A. Of course, I don't know. That is what he thought he wanted for it."

It further appeared from the testimony of this witness that after the making of the deed she had given a mortgage upon the property of $300.

It is very clear from the testimony of this witness that neither party, in the negotiations for this property, had expected that the land was to be deeded to defendant as a gift; and yet, as the transaction was closed, that is substantially what had been accomplished. The inference that the complainant did not fully understand the nature of the transaction, and that defendant took advantage of his condition, is irresistible. There is no doubt that he was moved by his fear of the results in the proceedings which Watts was about to institute, and, whatever else may be said, it is perfectly certain that no such program as the defendant herself testifies was in contemplation of the parties was carried out. We think, under the former rulings of this court, the decree should have been for complainant. See *Stuy-*

*vesant* v. *Wilcox*, 92 Mich. 228; *Smith* v. *Cuddy*, 96 Mich. 562; *Churchill* v. *Scott*, 65 Mich. 485; *McDaniel* v. *McCoy*, 68 Mich. 332.  See, also, *Allore* v. *Jewell*, 94 U. S. 506.  We think the circuit judge did not give due weight to the evidence, which establishes the fact, to our satisfaction, that the previous negotiations of the parties all involved a proposition to convey the land and take a mortgage back.

The decree will be reversed, and a decree entered in this court setting aside the deed.

The other Justices concurred