# CLARA B. CONGDON AND OTHERS v. CLARA B. CONGDON AND OTHERS.[1]

October 17, 1924.

No. 24,000, 24,030.

**Court can direct execution of express trust.**

1. A court of equity has power to direct the execution of an express trust upon request from the trustees for guidance in the performance of their duties.

**Enactment of foreign statute implies same construction as in state of origin.**

2. When a state adopts a foreign statute it presumably adopts the construction already given it by the state where it was first adopted.

**Rules of common law modified by statutes, not by the courts.**

3. Legislative action is unnecessary to affirm the existence of common law, but statutory enactment is essential to repeal, abrogate or change the rules or doctrine of the common law. It is the province of the legislature, and not of the courts, to modify the rules of common law.

**Limitations on disposition of property.**

4. A citizen may do as he will with his own only when it is lawful. Whether it is lawful depends on whether the disposition conflicts with the rules of law which may be applicable to the transaction in question, and with the lawful restrictions imposed by the previous owner.

**Rule against perpetuities.**

5. At common law the rule against perpetuities permitted a period within a life or lives in being and 21 years.

**Rule against accumulation of income.**

6. The rule against accumulations of income is of purely statutory origin, unlike the common law rule against perpetuities which is the outgrowth of judicial expression of public policy.

[1] Reported in 200 N. W. 76.

**Duration of express trust.**

7. By our statute the period of duration of an express trust personalty is determined.

**Statute of George III not part of our law.**

8. Statute of George III, 39 and 40, chapter 98, which materially changed the common law, was enacted subsequent to the Revolutionary War and the treaty of peace following that war, and does not affect the common law which became our law.

**Trusts governed by common law up to 1851.**

9. The common law as to trusts in real or personal property or both, prevailed in our territory from our beginning up to the enactment of chapter 43 and chapter 44, R. S. 1851.

**Act of 1875 governs all trusts of personal property.**

10. Chapter 53, p. 84, Laws 1875, being subdivision 5 of section 6710, G. S. 1913, abolished personal property trusts except as authorized by statute.

**Subdivision 6 in harmony with the common law.**

11. Subdivision 6, § 6710, G. S. 1913, specifies a period of duration of trusts in real and personal property in harmony with the common law, and resort may be had in the interpretation and administration of such trusts in personalty to the rules of the common law.

**Accumulations of income from personal property not prohibited.**

12. Subdivision 6, § 6710, G. S. 1913, covers the trust in question, but this statute does not prohibit accumulations of income from personal property within the period therein specified, and in absence of a statute on that question we must look to the rules of common law applicable to trusts in personal property for guidance, and the rules of common law permit such accumulations.

**Section 6687 not applicable to trusts in personalty.**

13. Section 6687, G. S. 1913, has no application to trusts in personal property. The common law, at the birth of our state, was in full force until 1875; our original statutes on uses and trusts related exclusively to real estate. As to personal property the common law trusts prevailed, unmodified by statute, until 1875. The enactments of subdivisions 5 and 6 authorizing the creation of trusts in personalty, though attached as amendments to the chapter pertaining ex-

clusively to real estate, abolished the common law trusts except as authorized by statute.

**When income from mining corporations' stock is not rents and profits.**

14. Where a donor owning stock in mining corporations owning ore lands being operated on leases, places the same in trust in good faith, dividends and income from such stock are not rents or profits from lands, but constitute income from personal property and must be treated as such.

**In equity both life tenant and remainderman protected.**

15. Equity protects both life tenant and remainderman, but the donor has given directions for the treatment of income from "wasting securities."

**Corpus of trust for remainderman and usual income for life tenant.**

16. It is the duty of the trustees to preserve the corpus of the trust for the remainderman and to secure the usual rate of income upon safe investments for the life tenant and to use a sound discretion in reference to each of these objects.

**Neither life tenant nor remainderman to get advantage at expense of the other.**

17. It is the duty of the trustees to consult the interests of both life tenants and remaindermen impartially so as not to give either an advantage at the expense or to the prejudice of the other.

Amicable suit in the district court for St. Louis county by the trustees under the "Congdon Trust" against its beneficiaries for the purpose described in the first paragraph of the opinion, specifying the questions to which the trustees desired answers from the court. The defendants jointly and severally admitted all the allegations of the complaint and joined with plaintiffs in requesting answers from the court to the specified questions. The facts are stated in the second and following paragraphs of the opinion. The matter was heard by Grannis, J., who made findings and conclusions and gave the instructions as detailed on page 354 et seq. From the judgment and decree entered pursuant to the order for judgment, plaintiffs and the three defendants who were not trustees, took separate appeals. Reversed and remanded with instructions.

*A. L. Agatin* and *F. H. DeGroat,* for appellant trustees.

*Gearhart & d'Autremont,* for appellant defendants.

*J. L. Washburn* and *John G. Williams, J. M. Martin* and *L. Friedel, Lancaster, Simpson, Junell & Dorsey* and *Egbert S. Oakley,* filed briefs as amici curiae.

WILSON, C. J.

This is a proceeding in equity in reference to the "Congdon Trust" seeking instructions and directions to the trustees as to the treatment and disposition of certain receipts consisting of dividends and distributions paid or made by certain mining corporations upon the shares of stock of such corporations held by the trustees as a part of the principal or corpus of the trust fund.

On August 3, 1916, Chester A. Congdon, as donor, executed to himself and his wife, Clara B. Congdon, and Walter B. Congdon, Edward C. Congdon and Marjorie Congdon (now Dudley), children of the donor and his wife, as trustees, for the benefit of all said persons and also three other children, to-wit: Helen Clara Congdon, Elizabeth Mannering Congdon and Robert Congdon who were then minors, a certain trust instrument transferring to the trustees a large amount of personal property consisting of bonds, shares of stock in corporations, and other personal securities, then owned and held by the donor, of a value exceeding three and a half million dollars, about one and one-half million dollars being represented by stocks of mining corporations which is the basis of the principal element of our consideration. All the property therein mentioned was transferred to the trustees on the date of the trust. The donor died on November 21, 1916. The trust has been in force and operation since the date of said trust instrument. The beneficiaries of said trust include all the heirs at law of said donor. No person interested in this trust has ever attempted in any manner to rescind, disaffirm, repudiate or otherwise attack or question the legality of the provisions of the "Congdon Trust" but, on the contrary, all interested persons strive to maintain the integrity of said trust, and the only object and purpose of this suit is to procure a construction

upon certain portions of the trust instrument and to have judicial instructions in reference thereto.

The donor died testate. He disposed of large holdings in mines and mineral lands by will. The property thus disposed of exceeded in value the properties transferred by the trust instrument. The trust property did not include any real estate.

By article 2 of the trust he clothed the trustees with power to invest the funds in their hands from time to time, but limited their field of investment to certain classes of securities.

Articles 3, 4 and 5 of said trust instrument read as follows:

## ARTICLE THREE

"All rents and royalties derived from mines or mineral lands (including oil lands), and dividends or other money distribution paid or made by corporations owning mines or such lands and produced therefrom, are part of the capital assets of the trust fund and if distributed as income would cause a diminution of said fund; therefore all rents and royalties from mines, mineral or oil lands, received by the trustees, and all moneys or other property paid or delivered to the trustees, whether as dividends or distribution of capital assets, or otherwise, by any corporation owning or operating mines or mineral land, or oil wells, or oil land, shall be treated by the trustees as capital assets of the trust fund, and not as income therefrom, unless it shall clearly appear that the money or property so received from any such corporation was not produced by such diminution of its capital assets; all such capital assets so received by the trustees shall be by them from time to time reinvested as aforesaid, as a part of the principal of the trust fund; provided, however, that the trustees may, in their discretion, treat not more than twenty per cent of each sum of money so received, as income, and distribute the same as such among the beneficiaries hereunder, as herein provided."

## ARTICLE FOUR

"All reasonable and proper expenses of the trust hereby created shall be paid out of the income therefrom as herein defined, and

the net income then remaining shall be distributed among the beneficiaries in quarter yearly instalments, as follows, namely:

"One quarter thereof to Clara Bannister Congdon, the wife of the Donor, so long as she shall live; the remaining three quarters among the six children of the Donor and his said wife, share and share alike, viz: Walter Bannister Congdon, Edward Chester Congdon, Marjorie Congdon, Helen Clara Congdon, Elizabeth Mannering Congdon and Robert Congdon; provided, however, that in no event shall the income paid to each such child in any calendar year, while under the age of forty years, exceed the following sums, to-wit:

"To any child under twenty-five years of age Two Thousand Five Hundred Dollars; to any child twenty-five years of age but not over thirty, Three Thousand Five Hundred Dollars; to any child thirty years of age but not over thirty-five, Five Thousand Dollars; to any child thirty-five years of age but not over forty, Ten Thousand Dollars.

"Whenever and as often as the share of such income accruing to any child in any such calendar year shall exceed the amount payable to her or him for such year, such excess shall be invested by the trustees in any such securities as they are authorized to acquire with the principal of the trust fund hereunder; and all investments so made by the trustees for any child shall constitute a separate and distinct trust fund for the benefit of such child and his or her issue; and if in any subsequent calendar year the share of the income accruing to any such beneficiary shall be less than the sum hereinbefore named as the annual limit for any calendar year, such deficit shall be made good out of the excess so invested by the trustees for any such beneficiary; and all such accumulation shall be turned over, either in cash or securities, to each such beneficiary, when he or she shall reach the age of forty years.

"If any such beneficiary shall die before reaching the age of forty years, leaving issue, such accumulation shall be forthwith distributed among such issue, share and share alike, per stirpes, but if such beneficiary shall so die leaving no issue, such accumulation shall fall into and become a part of the principal trust estate created by this indenture.

"Nothing herein contained shall authorize or empower the trustees hereunder to accumulate the rents and profits of real estate, but all such rents and profits shall be distributed quarterly, as aforesaid, among said beneficiaries, in the proportions stated in the preceding part of this Article and regardless of the limitations therein contained.

"Upon the death of the wife of the Donor, or upon the death of any of said children leaving no issue, the share of the income theretofore paid to such deceased shall thereafter be paid to the surviving children, and to the issue of any deceased child, share and share alike, per stirpes. If a child of the Donor, being a beneficiary hereunder, shall die, leaving issue surviving, the share of such income which would have been paid to such child if living shall thereafter be paid to the issue of such deceased child, share and share alike, per stirpes.

"Provided always, however, that nothing in this article contained shall require the trustees at any time to distribute all of the net income of the trust estate, but they may always retain in the banks such an amount of funds as they may deem necessary for the protection and advantage of the trust estate;

"Provided further that if any beneficiary hereunder shall at any time or times alienate, charge or dispose of the said income, or part thereof, or interest therein, or if by reason of his or her bankruptcy or insolvency or the occurrence of any other event, the said income shall wholly or in part fail or cease to be personally enjoyed by such beneficiary, but the same or any part thereof shall or but for this provision would, be received by or belong to or become vested in any party or parties other than such beneficiary, then and thereupon, and so long as such condition shall continue, the right of such beneficiary to any part of such income, shall cease and be suspended, and the said trustees, during the continuance of any such condition, shall have the power, in their discretion, either

"(a) To pay over to such beneficiary only so much of said quarterly instalments of income as may be necessary in their judgment to support and maintain such beneficiary, and his or her issue if any there be, in accordance with his or her station in life; and

the surplus of such income, if any, they shall invest in any such securities as they are authorized to acquire with the principal of the trust fund hereunder; or

"(b)   To expend all such income in the maintenance and support and education of such beneficiary and his or her issue, if any there be.

"In any such case of the accumulation of income under the foregoing provisions, such accumulation shall be paid over to the beneficiary on whose account the same shall have been made upon his or her becoming again vested with the right to such income, free from any and every claim whatsoever, or, in the case of his or her death, to his or her issue, per stirpes:

"Always provided, however, that the trustees shall never accumulate the rents and profits of real estate under the foregoing or any provisions in this indenture contained; and whenever and so long as the right of any beneficiary to any part of said income shall cease and be suspended, save as provided in paragraphs (a) and (b) of this article, the trustees, if they pay out or expend any money under either of. said paragraphs, shall first so utilize such rents and profits of real estate as they may then have, and which would have been paid to such beneficiary had his or her right thereto not ceased and been suspended as aforesaid, and if, after so doing, any such rents and profits remain, they shall forthwith distribute the same among the other beneficiaries hereunder whose right to said proportionate share of the income hereunder shall not have ceased or been suspended."

## ARTICLE FIVE

"This trust shall continue for the period of but no longer than, the lives of said Clara Bannister Congdon, Walter Bannister Congdon, Edward Chester Congdon, Marjorie Congdon, Helen Clara Congdon, Elizabeth Mannering Congdon, Robert Congdon, and Chester Adgate Condon II, the only child of said Walter B. Congdon, and for twenty-one years after the death of the survivor of them."

The trustees in this action sought instructions in reference to several features of the trust and the proper construction thereof as bearing upon their duties as such trustees.

The respondents in their cross appeal contend that if the income from the securities by article 3 be construed as rents and profits from real estate, such income should be entirely distributed to the life beneficiaries; and that, if such income is income from personal property, then it should be entirely distributed to the life beneficiaries in the proportion designated in article 4, for the reason, as they claim, that the accumulation of income from personal property is not permitted by the laws of our state.

## FINDINGS

The findings of the court include this:

"Ninth: That Article Three of said trust instrument provides as follows:

(Article Three stated in full.)

"That the only securities or property of the trust fund which fall under the operation of said Article Three of said trust and which are identified thereby are the stocks in the mining corporations * * * and that said Article Three has no operation upon or application to any other property of the trust; that in the administration of said trust the trustees have distributed as income to the life beneficiaries all the dividends and receipts by them from stocks of corporations other than said mining companies, and have distributed and are distributing as income to the life beneficiaries all the interest received by them on all the bonds and notes of the trust fund, but that with reference to the receipts by them of the distributions of said mining companies, upon which Article Three has operation, the said trustees have treated the receipts by them of all the distributions of said mining companies in the following manner, to-wit:

"(a) Of the receipts by the trustees of distributions of said mining companies which have not been clearly made to appear to them to result in the diminution of the capital assets of the cor-

porations making the same, as found in the Fifth finding hereof, the trustees have distributed as income to the beneficiaries twenty per cent of such receipts and have invested eighty per cent thereof in interest-bearing bonds or notes as directed by Article Two, as will more fully appear in detail from the table showing such distributions, being Exhibit 2 in the record, and a copy of which is hereto attached and made a part hereof.

"(b)   Of the receipts by the trustees of distributions which have been clearly made to appear to the trustees not to diminish the capital assets of the corporations making the same, as found in the Fifth finding hereof, the trustees have distributed the whole thereof as income to the life beneficiaries under said trust, as will more fully appear in detail from the table aforesaid Exhibit 2 hereto attached; and

"(c)   Of the receipt by the trustees of distributions which have been clearly made to appear by the corporations making the same as distributions of capital assets, as found in the Fifth finding hereof, and known to the trustees to be only such, the said trustees have invested the whole thereof in interest and income bearing bonds and other securities as directed by Article Two, as will more fully appear in detail by the table Exhibit 2 hereto attached."

[Exhibit 2 referred to above will be found at page 109 of the Record.]

## CONCLUSIONS.

As conclusions of law the court finds and decides:

"1.   That the main purpose and intent of the trust instrument, Exhibit "A" hereto attached, taken as a whole, was to give to donor's wife and children as life tenants, and the survivor of them, all the net income of the entire trust fund, with remainder consisting solely of the value of the corpus of the trust fund, as it existed at the time of the creation of the trust, to be held to the end of the trust period for the benefit of the remaindermen designated in the said instrument, and that said trust is valid, subsisting and enforceable trust, authorized and permitted by the statutes of Minnesota relating to express trusts.

"2. That the directions in Article Three of the trust for the treatment of the receipts by the trustees of the distributions by way of dividends or otherwise of mining companies or corporations identified by and which come under the operation of Article Three of the trust instrument, while intended by the donor for the preservation of the integrity of the capital or corpus of the trust estate, the court holds and decides that said directions will, if followed, result in accumulations of income unauthorized by the laws of this state, it being the court's decision that all distributions of mining companies identified by Article Three as hereinbefore found, in whatever form received by the trustees, as dividends or otherwise, constitute rents and profits of land, and accumulation of which as such is prohibited by the laws of the state, but that the directions of said Article Three may be eliminated by conversion as hereinafter provided without affecting or impairing the general purpose of the trust or the legality or validity thereof. [Reversed on appeal, see page 376.]

"3. That the power of sale and disposition granted by Article Two of said trust instrument is a valid power and constitutes one of the lawful purposes of said trust instrument, consistent with the whole scheme of the trust; and that said Article Two contains valid and lawful directions for the investment of the trust funds in the class of securities therein specified and provided, consistent with the purpose of said trust, as a whole.

"4. That the directions for accumulations of the income of the respective children of the donor, in excess of the amount payable to her or him in any calendar year, until he or she shall reach the age of forty years, as found in finding Number Thirteenth, are invalid, and each of said children beneficiaries is entitled to demand and receive the amount of such accumulations from the trustees, except as to Robert Congdon during his minority." [Reversed on appeal, see page 376.]

## INSTRUCTIONS

That, by reason of the findings and conclusions aforesaid, the court instructed and directed the trustees of said trust, the plaintiffs in this action and their successors, as follows:

"1. That as soon as practicable after the entry of the decree herein, having due regard to the marketability of said securities, and the interests of life tenants and remaindermen impartially, the trustees convert by sale or exchange all the stocks of mining corporations of the class identified by Article Three, of the trust, to-wit: the stocks of the following named companies:

Weed Iron Company,

Harvey Iron Company,

Canisteo Mining Company,

Calumet & Arizona Mining Company,

Leon Iron Company,

Wanless Iron Company,

Shenango Iron Mining Co.,

Grand Rapids Exploration Co.,

Munro Iron Company,

Anaconda Copper Mining Co.,

Greene-Cananea Copper Company,

Hedley Gold Mining Company,

North Butte Mining Company,

United Verde Extension Mining Co.

into permanent securities, which they are authorized to invest in, by the provisions of Article Two of the trust instrument.

"That in making said conversion, the said trustees shall exercise reasonable care and prudence, having due regard to the interests of the life tenants as well as remaindermen impartially, so as to preserve the capital value of the said stocks for the remaindermen, and to secure the usual rate of income upon safe investments for the tenants for life, and to use sound discretion in reference to each of these subjects.

"2. That until such conversion is completed, the trustees shall take the herein found value of each of said stocks as of August 3, 1916, being the date when the enjoyment of income of the trust had commenced, and treat the fund at said valuation as if it had been at that time converted into such permanent investments of that value, as is authorized by Article Two of the trust, and treat

the whole sums received by way of distributions from said mining companies upon each of said stocks until such conversion, as follows: So much of said distributions as will pay usual rate of income upon safe investments not exceeding six per cent per annum upon the valuation of said respective stocks as of Aug. 3, 1916, shall be treated as income of the trust and distributed by the trustees to life beneficiaries, as income under said trust, and the balance applied and treated as pro tanto conversion of the principal of the trust fund represented by each of said mining stocks, until the several sums so received and applied shall be equal to the value of each of said respective stocks as of August 3, 1916, as that value is found in the findings herein.

"3. That by reason of the conclusions above set forth and the directions given to the trustees, the court deems it unnecessary to make answer to the several questions propounded in the Amended Complaint, the matters involved therein having been fully covered by the findings, conclusions and instructions herein.

"The decree to be entered herein shall also provide that for the purpose of giving other or further directions to the trustees in the matters involved herein, the court shall retain jurisdiction of this case, with leave to the trustees to apply for further instructions, if they are so advised."

Pursuant to the findings a judgment and decree was entered from which both plaintiffs and defendants have appealed.

The equitable jurisdiction of the court has been properly invoked in this proceeding. A court of equity has power to direct the execution of an express trust upon request from the trustees for guidance in the performance of their duties. 26 R. C. L. 1372, § 233; Watkins v. Bigelow, 93 Minn. 210, 100 N. W. 1104; Mayall v. Mayall, 63 Minn. 511, 65 N. W. 942; Atwater v. Russell, 49 Minn. 22 and 57, 51 N. W. 624, 51 N. W. 629, 52 N. W. 26; 2 Perry, Trusts & Trustees (6th ed.) § 476A, note (a).

In the early consideration of the merits of this proceeding we are met with the inquiry as to whether or not directions for accumulations of income from personal property are permitted by our statutes of uses and trusts or whether the rules of common law are in force in our state.

This question was raised in Minnesota L. & T. Co. v. Douglas, 135 Minn. 413 on page 424, 161 N. W. 158, but the facts in that case did not call for a determination of it.

The state of New York passed a statute relative to uses and trusts and of powers. 1 R. S. 1829 (p. 727) c. 1, arts. 2 and 3. The territory of Minnesota in 1851, adopted a statute much the same as New York state. (R. S. 1851, c. 44 on Uses and Trusts, c. 45 on Powers, pp. 205-210). Chapter 44, R. S. 1851, is preceded by a chapter relative to Real Property. Section 1, chapter 44, R. S. 1851, reads thus:

"Uses and trusts, except as authorized and modified in this chapter, are abolished; and every estate and interest in lands shall be deemed a legal right, cognizable as such in the courts of law, except when otherwise provided by statute."

This language is retained in section 1, chapter 43, G. S. 1866, and also as section 6701, G. S. 1913. It was taken from the substance of 1 R. S. 1829 [N. Y.] p. 727, article 2, § 45.

Our territorial statute was carried in substantially the same form into chapter 43, G. S. 1866. Section 11 of chapter 44, R. S. 1851, states the purpose for which express trusts may be created.

Section 11, chapter 43, G. S. 1866, is to the same effect but with subdivision 5 omitted.

Chapter 53, p. 84, Laws 1875, added to section 11, G. S. 1866, the now fifth subdivision, as follows:

"Fifth—To receive and take charge of any money, stocks, bonds or valuable chattels of any kind, and to invest and loan the same for the benefit of the beneficiaries of such express trust, and the district courts of the state shall, on petition and hearing, have power to appoint a trustee for the purpose herein set forth, requiring such trustee to give such bond for the faithful execution of

such express trust as to the court may seem right and proper, and express trusts, created under the provisions of this clause, shall be administered under the direction of the court."

Section 6710, G. S. 1913, now contains the same provisions of said section 11, but with subdivisions 6 and 7 added by subsequent legislation and subdivision 6, which is involved in our present discussion, is in this language:

"6. For the beneficial interests of any person or persons, whether such trust embraces real or personal property or both, when the trust is fully expressed and clearly defined on the face of the instrument creating it: Provided, that the trust shall not continue for a period longer than the life or lives of specified persons in being at the time of its creation, and for twenty-one years after the death of the survivor of them, and that the free alienation of the legal estate by the trustee is not suspended for a period exceeding the limit prescribed in chapter 59."

Section 6687 and 6688, G. S. 1913, pertain to accumulation of rents and profits of real estate only.

On February 1, 1875, our statute limited the formation of a trust in lands to four specific purposes, namely:

"1. To sell lands for the benefit of creditors.

"2. To sell, mortgage, or lease lands for the benefit of legatees, or for the purpose of satisfying any charge thereon.

"3. To receive the rents and profits of lands, and apply them to the use of any person, during the life of such person, or for any shorter term, subject to the rules prescribed in chapter forty-five. [c. 59, G. S. 1913].

"4. To receive the rents and profits of lands, and to accumulate the same, for either of the purposes, and within the limits prescribed in chapter forty-five." [c. 59, G. S. 1913].

The common law as to personal property was in force as to private trusts only. There was then no way in which a trust could be made to endow any college, hospital or other charitable institution.

On February 3, 1875, there was introduced in the legislature

"A Bill to amend Section 11 of Chapter 43 of the General Statutes of Minnesota Revision of Eighteen Hundred and Sixty-six (1866), relating to uses and trusts."

The body of the proposed act was in the language of chapter 53, p. 84, of the Laws of 1875, as printed. The legislative committee amended the title of the bill by striking out "relating to uses and trusts" and inserting "being Section Thirty-seven of Chapter Thirty-two of, Statutes at Large," making the title which now appears in the book, and passed the bill, as so amended, and it was approved March 4, 1875. In the Revision of 1905, it was attached as subdivision 5 of section 3249, and chapter 53, Laws of 1875, was specifically repealed by section 5528, R. L. 1905.

Any comment upon the title to the original act would now be more curious than practical, except as we are called upon to note the "intention of the legislature" and also to learn the position of this court in prior decisions. Section "37" of chapter 32 of Statutes at Large does not relate to uses and trusts. That the act might have been open to the objections found fatal to chapter 132, p. 188, Laws of 1903, in Watkins v. Bigelow, 93 Minn. 210, 100 N. W. 1104, we need not consider. Whether it really became an unquestionable part of our statutes until 1905, we need not decide. But what was the intention of the legislature in adopting this chapter 53? Why did they pass it?

It is to be noted that this act, providing for investment and endowment trusts, embraces personal property exclusively; there is no repealing clause, and, in its terms, amends only the section which provides that "express trusts may be created for any, or either, of the following purposes."

We must determine the effect of this amendment by the language used and the law as it then existed, and the object to be accomplished. It is claimed by the language, quoted above, that the common law of trusts, as to personal property, as it pre-existed our original statute on uses and trusts, was wholly abolished at the time we enacted that statute. The statute reads:

"Uses and trusts, except as authorized and modified in this chapter, are abolished; and every estate and interest in lands shall be deemed a legal right, cognizable as such in the courts of law, except when otherwise provided by statute."

Every subsequent section in the entire chapter, in each statute, uses language most obviously applicable to technical trusts in real estate, and not in personal property. Some sections refer to sections in the previous chapter which is also devoted exclusively to realty. Thus our statutes, insofar as claimed to be applicable, have of themselves nothing to do with personal property, either directly or by inference. Our whole statutory law on this subject up to 1875 is in terms confined to real estate or its rents and profits.

The four provisions above given with the act of 1875 as subdivision 5 are inserted as section 11, chapter 43, G. S. 1878. Then in 1893, chapter 83, p. 202, Laws 1893, was adopted. It reads as follows:

"That section eleven of chapter forty-three of the General Statutes of one thousand eight hundred and seventy-eight, relating to uses and trusts, be and the same is hereby amended by adding at the end thereof the following words:

"Provided, however, that nothing in this chapter or in any law of this state contained shall be construed as preventing the creation of any trust in writing, to endure for a period not longer than the life or lives of specified persons in being at the time of its creation, and for twenty-one years after the death of the survivor of such persons; such writing to fully set forth the nature and terms of the trust; but all such trusts are hereby authorized and allowed; provided further, that any and all trusts which do not permit the free alienation of the legal estate by the trustee, so that, when so alienated, it shall be discharged from all trusts, shall be deemed and construed as heretofore and shall not be authorized by the provisions of this act."

"All acts and parts of acts inconsistent with the provisions of this act are hereby repealed."

Section 6710, G. S. 1913, and its predecessors as above mentioned, declare and define the only express trusts which can be fastened on such estate; and there the only trusts at all analogous to those now in question are mentioned in subdivisions 3 and 4, namely, rents and profits (from land) and accumulate them for the benefit of persons suggested by section 6687, G. S. 1913. There is nothing in any part of the statute tying up the trust in personal property to receiving and applying the income to the use of any person, or otherwise restricting the mode of appropriation.

The state of New York with substantially the same statute, although they had another statute pertaining to personal property, held that such language as is in our statute did not abolish the common law trust as to personal property. Kane v. Gott, 24 Wend. 641, 35 Am. Dec. 641 (decided 1840); Matter of Carpenter, 131 N. Y. 86, 29 N. E. 1005; 1 Minn. Law Rev. 228, Thurston.

The New York statute having been adopted by us, we must and do recognize that adjudged construction of a borrowed statute is borrowed with it. When we, in enacting our statute, copied the language of the New York statute, we are presumed to have adopted the construction already given by the courts to the copied statute, and we are to accept the judicial construction given by the state where it was first adopted. Ryalls v. Mechanics' Mills, 150 Mass. 190, 22 N. E. 766, 5 L. R. A. 667; Pratt v. Am. Bell Tel. Co. 141 Mass. 225, 5 N. E. 307, 55 Am. Rep. 465; Dunnell, Minn. Dig. § 8956. New York has a separate statute, touching personal property (1 R. S. of N. Y. 1829, p. 773, tit. 4), and hence some of their decisions may at first glance seem inconsistent. Apparently the state of Michigan also adopted the New York statute, above referred to. The Michigan court has, we believe, construed their statute as not abolishing the common law rule as to trusts, Toms v. Williams, 41 Mich. 552, 2 N. W. 814, and that personal property coming within trusts is, in Michigan, ruled by the common law. Palms v. Palms, 68 Mich. 335, 363, 370, 36 N. W. 419, 434.

Wisconsin also adopted the New York statute and then fell into confusion as to whether the common law trust as to personal property was abolished. The language of Dodge v. Williams, 46 Wis.

70, 1 N. W. 92, 50 N. W. 1103, wherein it was said: "The statute limiting the rule against perpetuities to realty, manifestly abrogates the English doctrine as applicable to personalty," became the subject of much discussion as to whether or not it was language of judicial determination, or obiter dictum, but finally, because it had reached its majority, was adopted as a rule of property, and at a time when it would seem that at least some of the members of that court thought the decision was wrong. The court said: "Whether the decision was right or wrong, to disturb it now by mere judicial power would be a far greater mistake than the making thereof, if it were clearly erroneous, when such a question has been so long settled as to have become firmly impressed upon property, the maxim, stare decisis, et non quieta movere, should be regarded as a governing principle in respect thereto." Becker v. Chester, 115 Wis. 90, 114, 91 N. W. 87; Danforth v. City of Oshkosh, 119 Wis. 262, 97 N. W. 258.

Professor Gray in his work on the Rule against Perpetuities, (3d ed.) § 751, says:

"In Michigan, Wisconsin and Minnesota, the first and second parts of the New York system have been adopted with scarcely an alteration. Strangely enough, those States have not adopted the provisions of the third part of the New York system, that which relates to personal property."

Reverting, then, to our own state we recognize that no legislative adoption is necessary to affirm the existence of the common law, but that statutory enactment is essential to repeal, abrogate or change the rules or doctrine of the common law. The rules of common law are not to be changed by doubtful implication. State v. Cent. Vt. R. Co. 81 Vt. 459, 71 Atl. 193, 21 L. R. A. (N. S.) 949; Dewey v. St. Albans Trust Co. 60 Vt. 1, 12 Atl. 224, 6 Am. St. 84; State ex rel. v. Grymes, 65 W. Va. 451, 64 S. E. 728, 17 Ann. Cas. 833, 836; Harrison v. State, 22 Md. 468, 85 Am. Dec. 658; Bandfield v. Bandfield, 117 Mich. 80, 75 N. W. 287, 40 L. R. A. 757, 72 Am. St. 550. But where the implication is obvious it cannot be ignored. No statute is to be construed as altering the common

law farther than its words and circumstances import. Shaw v. Railroad Co. 101 U. S. 557, 565, 25 L. ed. 892. We must recognize that it is the province of the legislature and not of the court to modify the rules of the common law. In re Hulett v. Carey, 66 Minn. 327, 69 N. W. 31, 34 L. R. A. 384, 61 Am. St. 419. The court has no more right to abrogate the common law than it has to repeal the statutory law. Francis v. W. U. Tel. Co. 58 Minn. 252, 59 N. W. 1078, 25 L. R. A. 406, 49 Am. St. 507. Of course the common law applies to our state. State v. Pulle, 12 Minn. 99 (164) supra. Whether we came under the common law at a heroic period or under a heroic leader, as indicated in respondent's brief in Dutcher v. Culver, 24 Minn. 584, 612, 616, is not of special importance (though interesting) here, because, for the purpose of this case, it is the same whether the common law of England which became of force in this country may be said to be the common law at the time of the Revolution or whether it was the common law of England in force at the time of the ordinance of 1787. Either is sufficient here. We cannot, however, say that the inquiry as to how the common law became the law of the region comprising the Northwest Territory is "more curious than useful." Formerly England had little interest in trusts in personal property as the land was the corpus of their large fortunes. In this age, in our own country personal property is largely the corpus of large estates.

The right of property generally includes the right freely to possess, use, enjoy and dispose of the things which are subject to ownership. The right of property is hedged about with restrictions and limitations not always appreciated by the average citizen. The sovereign state has the unquestioned right to enforce proportionate contributions of property from private individuals for the support of the government, and does so in the system of taxation. This right was emphasized in war time. Symptoms of reform spring up here and there, in our state and nation, which tend toward the decentralization of wealth. Under our system of jurisprudence the individual citizen has the right to toil and to accumulate wealth. His achievements are largely the incentive for aggressive activity. If he is to be deprived of the happiness he may find in attainments and

achievements he becomes less useful to his community and to society. The privileges, which he enjoys under our law, give him encouragement in his particular activity. Naturally he is ambitious to better provide for those who, by nature or law, are dependent upon him or entitled to his bounty. To what extent he is to be limited in providing safeguards for those who, by lack of experience, may be less provident, is for the determination of the legislature. That body will recognize the economic and political advantages resulting from a stimulation to toil and from encouragement to thrift and from the exercise of energy and diligence. They will not overlook the fact that the American people spend from their total personal, state and national income 14 per cent in waste and 22 per cent for luxuries. This does not include investments in worthless stocks. The human race may well profit by using the busy honey bee as an example. The drone is held in little respect. No policy should be adopted that would tend to make us a nation of drones. Idleness is the father of moral delinquency. Vice is detrimental to society and to government. It is better to adopt that policy that leads the citizen to vigilance and labor, and that every honorable, successful achievement shall have its just reward. Such should be the inherent right of American citizenship. It is best that the rash of ambition may develop on any citizen.

The common law has always given an owner of property an extensive power of imposing his will with respect to his property—a power known as the power of dominion. A citizen may do as he will with his own only when it is lawful, and whether it is lawful depends on whether the disposition conflicts with the rules of law which may be applicable to the transactions in question, and with the lawful restrictions imposed by the previous owner. Our policy is to guard against the creation of an aristocracy and to compel every individual in a measure to accumulate, and, at least, to sustain his fortune by the strength of his individual superiority and ability, and to avoid an artificial inequality of persons or a deterioration of character. The tendency of restriction is to say that there is no objection to an individual receiving a large fortune by way of gift provided he has unfettered control of it. The theory

of restriction is that the recipient should be made to take a "sporting chance" on his ability to keep it, without depending upon the prerogative of the dead. Responsibility develops both manhood and citizenship.

The ownership of property does not carry with it an unqualified right of disposal. For reasons of public policy the law imposes some restraints. One of the most important of these restraints is the rule against perpetuities. A perpetuity is something which may last forever. The object of the rule is to prevent property from being tied up and kept out of commerce or retired from circulation in the commercial world. The rule also tends to preserve the quality of our people. The period permitted at common law was within a life or lives in being and 21 years. 1 Perry, Trusts, (6th ed.) § 393; Cochrane v. Schell, 140 N. Y. 516, 35 N. E. 971, "Within a life or lives in being" includes a posthumous child; i. e., a child en ventre sa mere is a life in being so that the period was really a life or lives in being and 21 years and 9 months. U. S. Fidelity & G. Co. v. Douglas Trustee, 134 Ky. 374, 120 S. W. 328; Andrews v. Lincoln, 95 Me. 541, 50 Atl. 898, 56 L. R. A. 103; Philadelphia v. Girard, 45 Pa. St. 9, 84 Am. Dec. 470; Thellusson v. Woodford, 4 Ves. Jr. C. R. 227.

The rule against accumulations of income is of purely statutory origin, unlike the common law rule against perpetuities, which is the outgrowth of judicial expression of public policy instead of an outgrowth of legislative enactment, 21 R. C. L. 285. Today these periods of duration are generally fixed by statutes in different states.

Under the old law alienation might be suspended for any number of lives in being and 21 years, and of course, for 21 years as a distinct period, independent of lives. This was settled by Cadell v. Palmer, 1 Cl. & F. 372, Id., 10 Bing. 140. While this decision was made after the adoption of the New York statute which we have cited, the principle was previously regarded as generally received. In the Thellusson Act the period of 21 years was adopted as more reasonable and safer than life estates in guarding against remote vesting.

In Minnesota the absolute power of alienation of real estate cannot be suspended for a longer period than during the continuance of two lives in being, section 6665, G. S. 1913, except under certain conditions. Section 6665, G. S. 1913. But our statute succeeds the common law as to trusts and fixes the period to the "life or lives of specified persons in being at the time of its creation, and for twenty-one years after the death of the survivor of them." Subdivision 6, § 6710, G. S. 1913. As to real estate, the common law as to accumulations is abrogated by section 6687, G. S. 1913. This rule operates to prevent the undue postponement of the vesting of future interests, while certain subsidiary rules are recognized by the courts and enforced as a means of preventing the unreasonable accumulation of property, the imposition of unreasonable restraints or alienation, and to prevent undue restrictions on the enjoyment of property.

The rule against perpetuities operates under certain circumstances to render nugatory provisions or directions for the accumulation of rents and profits of property beyond a certain period. In the absence of legislation the courts gave effect to the rule by holding that the provisions for accumulation should be disregarded if their effect was to postpone the vesting of the estate beyond the period permitted by the rule against perpetuities. Andrews v. Lincoln, 95 Me. 541, 50 Atl. 898, 56 L. R. A. 103; Southampton v. Hertford, 2 Ves. & B. 54. However, the rule did not limit the number of lives within which an accumulation could be permitted to run, and the courts held an accumulation good during the lives of several persons all living at the time. Thellusson v. Woodford, 4 Ves. Jr. C. R. 227. This was perhaps on the theory that all the candles were burning at the same time. This decision, however, is pointed to as showing the danger of allowing accumulations during the lives of a considerable number of persons.

This decision, as well as the social, economic and financial progress in England disclosed conditions that caused the enactment of the statute of George III, 39 and 40, chapter 98. With this statute we are not concerned. This statute, which has so materially changed the common law rules as to trusts, was subsequent to the Revolution, and also subsequent to the Treaty of Peace following

the Revolutionary War, and hence does not affect the common law which became our law. Such common law prevailed in our territory from our beginning up to and until the taking effect of chapters 43 and 44, G. S. 1851, and we conclude that except as abrogated by that statute all the rules of the common law as to trusts in real or personal property, or both, were in full force, save only the privilege of cy pres.

This court in Baker v. Terrell, 8 Minn. 165 (195) (1862) said:

"There can be but little doubt that the chapter of our statutes concerning uses and trusts relates to real property only."

Again in Re Tower's Estate, 49 Minn. 371, 52 N. W. 27 (1892), this court affirmed the proposition that as to personal property the common law rule as to trusts still prevailed in Minnesota; and in that connection said [page 376]:

"And in this state the statutory provisions in respect to trusts in real estate must, in proper cases, be construed in connection with the common-law rule in force here, and above referred to, in respect to trusts in personal property and proceeds of real property converted into personalty."

In Shanahan v. Kelly, 88 Minn. 202, 92 N. W. 948 (1903), this court [at page 210] used this language:

"The answer to the question depends upon whether all express uses and trusts, including charitable ones, in personal property, are prohibited by G. S. 1866, c. 43, § 1 (G. S. 1894, § 4274), except those therein enumerated  *  *  *  Whether this statutory rule applies to trusts in personal property has not been directly decided. Prior to the enactment of Laws 1875, c. 53, it seems to have been the understanding of the bench and bar of the state that it did not. Baker v. Terrell, 8 Minn. 165 (195). But since that time it has been assumed in the cases cited [German Land Assn. v. Scholler, 10 Minn. 260 (331); Little v. Willford, 31 Minn. 173, 17 N. W. 282; Atwater v. Russell, 49 Minn. 57, 51 N. W. 629, 52 N. W. 26; Lane v. Eaton, 69 Minn. 141, 71 N. W. 1031] in support of the rule, that all trusts in both real and personal property were abolished, except

as authorized by the statute. It is true that in those cases the subject of trusts in real property was alone under consideration * * *. It is obvious from the mere reading of chapter 43 as it now stands that, whatever may have been the rule prior to 1875, all express trusts, including charitable trusts, in personal property, except as provided therein, are abolished, precisely as are trusts in real estate. There is no reasonable rule of construction which will exclude personal property from trusts prohibited by the statute, and we so hold."

In Watkins v. Bigelow, 93 Minn. 210, 223, 100 N. W. 1104 (1904), it was said:

"The law then was, and had been from the beginning of the state, that express trusts, except as authorized and modified by the statute, were prohibited."

In Y. M. C. A. v. Horn, 120 Minn. 404, 407, 139 N. W. 806 (1913), this language was used:

"Assuming for the time being that the trust property consists entirely of personalty; and as the law is, and has been 'from the beginning of the state, that express trusts except as authorized or modified by statute' are prohibited (Watkins v. Bigelow, 93 Minn. 210, 223, 100 N. W. 1104-1109), we must, in determining the above question, look exclusively to our statutes. Furthermore, since the decision in Shanahan v. Kelly, 88 Minn. 202, 92 N. W. 948, there is no doubt but that this rule applies to all trusts, whether public, charitable, or otherwise, and whether in personalty or realty."

In Walso v. Latterner, 140 Minn. 455, at the foot of page 458 [168 N. W. 353] it is said:

"It is true that New York statute does not limit the creation of trusts in personal property, and that our statute abolishing all express trusts, except such as are authorized by the chapter, applies to trusts in personal property, as well as in real property."

In re Trusteeship under the Will of L. H. Bell, 147 Minn. 62, 68, 179 N. W. 650 (1920), it is said:

"The contention that the trust created by the will is invalid, if the construction of the district court is adopted, is not sustained. The entire estate consists of personalty, which the trustee is to take charge of and invest. A trust to invest funds for the benefit of a class, as provided by subdivision 5, § 6710, G. S. 1913, is not invalid because it may suspend the power of alienation beyond the period fixed by statute, where personal property is the subject of the trust. Y. M. C. A. v. Horn, 120 Minn. 404, 139 N. W. 806; Minn. Loan & Trust Co. v. Douglas, 135 Minn. 413, 161 N. W. 158. An interesting criticism of the Horn case was made by Professor Thurston in 1 Minn. Law Rev. 226-229, where its apparent conflict with the doctrine of other decisions is pointed out."

The Tower case involved the important question' now under consideration and the decision was necessary, i. e., the question was before the court for decision and determination. The soundness of the Tower decision has never been questioned, and no argument, logic or reason has been offered in support of any subsequent decision, remarks or obiter dicta in which a contrary view has been advanced. In none of the decisions from which we have quoted was there a holding that trusts in personal property were abolished by section 1, chapter 44, R. S. 1851. That question was not involved in, or necessary to, the decisions of the cases which have been before the court, and none can be claimed as overruling the Tower case to the effect that the common law was in effect, in Minnesota, as to personal property trusts generally until, at least, chapter 53, p. 84, Laws 1875, became a law. True, this act and subsequent amendments must be construed strictly and not as abrogating the common law beyond the necessary import and reasonable implication of their language.

The Shanahan case did not hold that prior to the enactment of the 1875 law our trust statute abolished all trusts in personal property. It admits that it was then the understanding of the bench and bar of the state that such trusts were not abolished. In that case we inferentially recognized that trusts could exist in personal property in Minnesota, under the common law, after the

enactment of our first statutes on trusts, but held that after the enactment of 1875, trusts not authorized by statute were abolished as to both real and personal property. This was after subdivision 6 of our statute became a law and this subdivision 6 specifies a period of duration in harmony with the common law.

The court did refer to Baker v. Terrell, 8 Minn. 165 (195), as evidencing the understanding of the bench and bar that prior to the enactment of chapter 53, p. 84, Laws 1875, the chapter of Uses and Trusts did not apply to personal property. The slight mention of this case and the omission of any reference to the Tower case is significant. No reference or explanation is made to the direct decision, in these cases, to the effect that the common law was in force as to personal property. This court in the Shanahan case did not intend to hold adversely to the Baker case nor to the Tower case. Their holdings were neither overruled nor discredited. In the Horn case this court inadvertently said that a trust in personalty could not be created in this state before the enactment of chapter 53, p. 84, Laws of 1875. This erroneous statement had previously been made in Watkins v. Bigelow, 93 Minn. 210, 100 N. W. 1104.

We are of the opinion that prior to the act of 1875 common law trusts as to personalty existed in this state. We construe the intent of the legislature in this act to intend to abolish trusts in personal property, except as provided by statute, and that it intended to, and did, incorporate and ingraft the act of 1875 upon a statute then relating exclusively to real estate, and made that statute from that time abolish common law personal property trusts except as therein authorized. Otherwise it was without purpose. To say that it reaffirms the common law, which was then in force in the state, in part, gives no reason for its creation because in that event it gave nothing and it took nothing away. We must construe a statute with reference to the object it was intended should be accomplished by it. In order to learn this object it is proper to consider the occasion and necessity of the enactment. That construction must be applied that will best advance its object. Whatever is necessarily or plainly implied in a statute is as much a

part of it as that which is expressed, and we think any fair and reasonable construction leads to the conclusion that this act intended to make a change in the law of the land. In fact we must assume that the legislature knew the existing law and that its purpose was to make some change. 36 Cyc. 1145b. True, the language is not strong in support of this construction which is at least a reasonable one.

This is consistent with the other decisions of this court including Shanahan v. Kelly, 88 Minn. 202, 92 N. W. 948; Y. M. C. A. v. Horn, 120 Minn. 404, 139 N. W. 805; Walso v. Latterner, 140 Minn. 455, 168 N. W. 353; In re Bell, 147 Minn. 62, 179 N. W. 650. This assumption as it is termed in the Shanahan case might well, if necessary, be accepted as a rule of property. In our opinion this court in the cases cited intended to and did, construe this statute the same as we now construe it. We affirm such construction. Such judicial construction is as much a part of the statute as if plainly written into it originally. 36 Cyc. 1143 (v) 91. Even an erroneous interpretation of a legislative enactment acquiesced in for such length of time ought not to be disturbed. Otherwise confusion, uncertainty and bad law must follow. The act of 1875 abolished the common law trusts in personal property. There is no statutory limitation against directions for accumulations. The statute leaves the court free to apply the rules and principles of the common law to such trusts. The limitations in the real estate chapters are wholly inapplicable and hence resort may still be had, in the interpretation and administration of such trusts so created, to the rules of the common law, in aid of the statute.

Subdivision 6 of section 6710, G. S. 1913, covers the trust under consideration and presents the inquiry as to whether under this statute directions for accumulation of income from personal property are prohibited. It seems plain that the trust in this case, which is now attacked, is a trust "for the beneficial interests" of the persons named. It is equally plain that this statute does not prohibit accumulations of income from personal property within the period therein specified, and, in the absence of a statute on that question,

we may look to the common law applicable to trusts in personal property for guidance.

Article 3 of the "Congdon Trust" contains the specific language which is the basis of the present element of consideration. The trial court adopting a view contrary to our conclusion and holding that the rules of common law applicable to direction for accumulations do not exist in Minnesota, decided that the intent of article 3 must depend for its support on the authority of section 6687, G. S. 1913, defining the period during which alienation of the legal estate may be suspended, and this statute insofar as here material reads as follows:

"Accumulations of Rents and Profits—An accumulation of rents and profits of real estate, for the benefit of one or more persons, may be directed by any will or deed sufficient to pass real estate, as follows:

"1. If such accumulation is directed to commence on the creation of the estate out of which the rents and profits are to arise, it must be made for the benefit of one or more minors then in being, and terminate at the expiration of their minority.

"2. If such accumulation is directed to commence at any time subsequent to the creation of the estate out of which the rents and profits are to arise, it shall commence within the time in this chapter permitted for the vesting of future estates, and during the minority of the persons for whose benefit it is directed, and shall terminate at the expiration of such minority."

Article 3 of the "Congdon Trust" exceeds the period of duration as specified in the statute last quoted. We are of the opinion that this statute has no application, and that the trust arising from article 3 is valid under subdivisions 5 and 6, § 6710, G. S. 1913.

We have covered our previous decisions bearing upon the question when trusts of personal property were first regulated by statute in our state. The arguments of counsel show that an apparent view has grown up that prior to 1875 the common law as to private trusts in personalty was not in full force in this state.

We think this view erroneous. In fact our conclusion on this branch of this case is: That the common law, from the birth of our state, was in full force up to the act of 1875; that our original statutes on uses and trusts related exclusively to real estate; that as to personal property the common law trusts prevailed, unmodified by statute until 1875; that the enactments of subdivisions 5 and 6 authorizing the creation of trusts in personalty, though attached as amendments to the chapter pertaining exclusively to real estate, abolished the common law trusts, except as authorized by statute, and that the Baker case and the Tower case have never been overruled.

The trial court reached its second conclusion to the effect that article 3 permits unauthorized accumulations upon the ground that "all distributions of mining companies * * * in whatever form received by the trustees, as dividends or otherwise, constitute rents and profits of land." We have held that royalties or income derived from mining leases are rents and profits of real estate. Minnesota L. & T. Co. v. Douglas, 135 Minn. 413, 161 N. W. 158. But here there are corporations which own the leases from which such royalties are produced. A large amount of capital stock of such corporations is a part of the corpus of this trust. The decedent was a stockholder in such corporations. A part of the income which this trust now receives comes from the stock in such corporations in the form of dividends. It does not come direct from the leases to the estate as it would had the donor been the lessor and then turned his holdings into this trust in that form. The trial court adopts the theory that the form in which rents and profits from mineral lands may be paid, whether paid directly to the owner according to his interest in the property from which the rents and profits are derived, or paid in the form of dividends on stock in a corporation which owns the producing interest in the land, is immaterial. The trial court has acted upon the assumption that the court is bound to look through the form to the substance, and if it is found in fact, as he claims it is in this case, that the accumulations authorized by the trust instrument result from rents and profits of real estate, the statute applies.

It is not claimed or even intimated that these corporations were formed to evade the consequences of the decisions in the Douglas case. It is not claimed that these corporations were created with a corrupt intent to evade the law. Had these conditions been created for such purpose and adopted as a scheme or subterfuge to escape such consequences, the court would be justified in looking through the form to the substance. Or rather it is better to say that equity will always look through the form to the substance but, unless it finds such corrupt intent present, it will be satisfied to permit the donor to use all legal privileges. It would then be analogous to schemes to cover usury and the court would disregard the form and reach the ultimate truth. Form will not control, and there is no shift or device on the part of the lender, in a usury case, to evade the law, under or behind which the law will not look to ascertain the real nature and object of the transaction.

Here there is not a scintilla of evidence, or even a suggestion or suspicion of any intent to resort to any scheme or device to avoid anything. On the contrary, the capital stock in the various corporations owning mining properties must have been acquired and accumulated in the best of faith. Owning such property, the donor in good faith executed this trust, and perhaps availed himself of the opportunity offered by the form of his holdings. In contemplation of law, a corporation is an artificial being or person created by law, having a legal entity entirely separate and distinct from the individuals who compose it, with the capacity of continuous existence or succession notwithstanding changes in its membership, and having also the capacity, as such legal entity and artificial person in the law, of taking, holding and conveying property, entering into contracts, suing and being sued, and exercising such other powers and privileges as may be conferred on it by the law of its creation, just as a natural person may. The corporation is of the utmost importance to the industrial and commercial world. It is essential to the welfare of our business interests. There was no impropriety in the donor owning this corporation stock. It was personal property. Thompson, Corp. § 3465; Fletcher, Cyc. Corp. p. 5615, § 3429; 14 C. J. 387; Baldwin v. Canfield, 26 Minn. 43,

1 N. W. 261, 276. There could be no impropriety in his using it in the same way as the law permits him to use other personal property. The effect of the decision of the trial court was, for all practical purposes, to put the corporations out of existence. It disregards their legal entity. It ignores the rights of the corporation as created by law, and undertakes to treat the donor as the sole owner, to the extent of his interests, of that property which the corporation owns. It fails to distinguish the legal rights of a stockholder from the legal rights of the corporation.

We find nothing in this case to justify the court in so disregarding the legal personalty of these corporations. The effect of the decision is to say that the stockholder is the legal owner of the land which is in fact the property of the corporation. Of course "the abstraction of the corporate entity should never be allowed to bar out and pervert the real and obvious truth." 14 C. J. 61. There can be no doubt of the power of the court to look through the form of a corporation and determine the question of the stockholder's right in order to ascertain whether he has received income taxable by Congress without apportionment. Eisner v. Macomber, 252 U. S. 189, 40 Sup. Ct. 189, 64 L. ed. 521, 9 A. L. R. 1570. Again in tax matters, like usury, the inquiry in such a case is whether, upon the evidence, there was any corrupt agreement or device or shift to evade the law or avoid the prohibitions. Likewise deeds may, in fact, be mortgages. Equity's vision is not limited by formal papers, but it looks through the form to the heart of the transaction.

The facts in this case do not permit the application of these principles, for the very simple reason that the donor never resorted to a corporation as a form of cover. He acted openly and apparently under a well founded conviction that he had a legal right to do what he in fact did. The donor was an able lawyer, and he prepared this trust instrument in full recognition of the laws of the state inhibiting accumulations of rents and profits of real estate, and it contains in three places imperative injunction to the trustees against such accumulations. In articles 4 and 9 is this language:

"Nothing herein contained shall authorize or empower the trustees hereunder to accumulate the rents and profits of real estate, but all such rents and profits shall be distributed quarterly, as aforesaid, among said beneficiaries, in the proportions stated in the preceding part of this Article and regardless of the limitations therein contained." * * *

"Always provided, however, that the trustees shall never accumulate the rents and profits of real estate under the foregoing or any provisions in this indenture contained." [Art. 4]

"Nothing in this indenture contained shall be construed to authorize the accumulation of any rents and profits of real estate forbidden by the laws of the State of Minnesota." [Art. 9, Sec. 15]

We are of the opinion that the trial court was in error in holding that the dividends from the mining corporations constituted rents and profits of land, and we hold that such dividends are income from personal property and must be treated as such. The instructions of the trial court to the trustees to dispose of the stocks of mining corporations of the class identified by article 3 of the trust, cannot stand.

Paragraph 1 of the conclusions of law of the trial court is correct. Paragraph 3 thereof is correct in substance and should stand as in confirmation of the authority therein approved, when the trustees in their judgment and discretion may wish to exercise it. Paragraphs 2 and 4 thereof are erroneous.

Obviously the main purpose of this trust was to give to the wife and children all the net income of the trust fund, with the remainder consisting solely of the value of the corpus of the trust fund, as it existed at the time of the creation of the trust, to be held to the end of the trust period for the benefit of the remaindermen. We are of the opinion that the trust is a valid and enforceable trust under the laws of our state.

The trustees' method of treatment of the receipts in the form of dividends from these mining corporations in the past, according

to the method provided by article 3, as construed by them, and which has the approval of the trial court, is proper and is in accordance with the true spirit of this trust.

Fortunately the donor has given directions by article 3 for the treatment of the income from "wasting securities." In the absence of such directions in the creation of the trust, the rules of equity would protect both the life tenant and the remaindermen. It is the duty of the trustees to preserve the corpus of the trust for the remaindermen, and to secure the usual rate of income upon safe investments for the life tenants, and to use a sound discretion in reference to each of those objects. They cannot postpone the yielding of income for the increase of capital, nor select a wasting or hazardous investment for the sake of greater present income. The value as a fund should be ascertained at the time when the enjoyment of the income of it is to commence and what should be regarded as income be computed upon that basis. In short, it is the duty of the trustees to consult the interests of both life tenants and remaindermen impartially so as not to give either an advantage at the expense or to the prejudice of the other; and it is the duty of courts of equity to preserve the proper relation between capital and income, so that the integrity of the corpus of the trust may not be destroyed or impaired. The object of the rule is to secure a fair adjustment of the benefits of all the cestui que-trustent in succession. Underhill, Law of Wills, § 433; 1 Perry, Trusts, § 450; 2 Perry, Trusts, § 539, 545 note (a) 542; Lewin, Trusts (from 8th Eng. ed.) pp. 298, 300; Loring, Trustee's Handbook (3rd ed.) p. 126.

It may well be said that the protective measures for the life tenant as provided in article 3, are at least equally as stringent as the rules of equity, and perhaps more liberal to the life tenant. Comparative figures appear on Exhibit 3 in the record. The direction of the donor to the trustees to treat not more than 20 per cent of the receipts as income cannot be disregarded with impunity. Estate of Wells, 156 Wis. 294, 144 N. W. 174.

The judgment and decree of the lower court are reversed, and a judgment and decree will be entered in accordance with the views herein expressed, and instructions and directions will be given the trustees pursuant thereto.

HOLT, J. (concurring in part.)

I concur in the disposition of the case, but consider obiter a decision on the status of personal property trusts prior to the enactment of chapter 53, p. 84, Laws 1875. I do not agree to the conclusion that since that date such trusts are in any manner governed or restricted by the common law rules as the same existed at the time this state was organized. The well-considered Horn case was decided upon the proposition that the common law rule against perpetuities was not in force here since 1875, hence the only restrictions or limitations upon the authorized trusts are those imposed by the statutes. The sole authority for the trust here involved is subdivision 6 of section 6710, G. S. 1913, and that contains no restrictions upon accumulations of income from personal property placed in trust, except as affected by the time limit therein set. Under the facts found, the shares of mining stock, placed in trust with full power of disposition at any time by the trustees, cannot be held other than personal property. And, even were it otherwise, I am of the opinion that the directions in article 3 of the trust instrument make provision for the protection of the remaindermen similar to those a court would properly make in case of trust property of such "wasting" nature as mines.